UNITED STATES of America, Appellee,

v.

Vladimir SOKOLOV, a/k/a Vladimir Dmetrivich Sokolov, Vladimir Sokolov-Samarin, Vladimir Samarin, Appellant.

No. 524, Docket 86–6157.

United States Court of Appeals, Second Circuit.

Argued Dec. 12, 1986.

Decided March 24, 1987.

---

Kevin W. Smith, Hamden, Conn. (Brian M. Gildea, New Haven, Conn., of counsel), for appellant.

Michael Wolf, Deputy Director, Office of Special Investigations, Crim. Div., Dept. of Justice, Washington, D.C. (Stanley A. Twardy, Jr., U.S. Atty. for Dist. of Conn., Neal M. Sher, Director, Office of Special Investigations, Joseph F. Lynch, Bruce J. Einhorn, Aron A. Golberg, Trial Attys., of counsel), for appellee.

Before OAKES, CARDAMONE, and DAVIS,* Circuit Judges.

OAKES, Circuit Judge:

This appeal by Vladimir Sokolov is from a judgment of denaturalization rendered by the United States District Court for the District of Connecticut, Thomas F. Murphy, Judge, pursuant to section 340(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1451(a) (1982). Under section 340(a), a person who has been admitted to citizenship may be denaturalized if the order admitting him and his certificate of naturalization "were illegally procured or were procured by concealment of a material fact or by willful misrepresentation." The district court ordered Sokolov denaturalized because he collaborated with the Nazis during World War II, and thus was ineligible for a visa or for naturalization as a United States citizen, and because he concealed his wartime activities from immigration and naturalization officials when he applied for a visa and again later when he applied for naturalization.

Government proof at trial was to the effect that Sokolov, a Russian living in the German-occupied Soviet Union, worked voluntarily as a writer for and later also as deputy chief editor of the Russian-language newspaper *Rech* ("Speech"), which was published by the German army. Under the pseudonym "Samarin," Sokolov wrote anti-Semitic articles urging the Soviet population to support anti-Jewish/Bolshevik actions taken by the Nazis, and articles criticizing the United States and Great Britain and seeking to aid in their military defeat. In addition, as deputy chief editor of *Rech*, Sokolov edited articles with these same themes.

On appeal, Sokolov urges that the Government failed to prove by the clear, unequivocal and convincing evidence required by *Fedorenko v. United States*, 449 U.S. 490, 505, 101 S.Ct. 737, 746, 66 L.Ed.2d 686 (1981), that he made material misrepresentations about his activities to immigration officials. He argues too that the evidence was insufficient to support the conclusion that his visa and naturalization

* Of the United States Court of Appeals for the

were illegally procured. He claims, first, that there was insufficient evidence that he "advocated or assisted in the persecution of any person because of race, religion, or national origin," and hence that the Government failed to show that he was ineligible to receive a visa by virtue of section 13 of the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009, 1014 (1948), as amended, ch. 262, 64 Stat. 219, 227 (1950) (the "DPA"). *See United States v. Sprogis*, 763 F.2d 115, 117 n. 2 (2d Cir.1985). Second, Sokolov argues that the evidence was insufficient to prove that he was ineligible to receive a visa as a displaced person under section 2(b) of the DPA, 62 Stat. at 1009, by reason of having "voluntarily assisted the enemy forces ... in their operations against the United Nations," within the meaning of the Constitution of the United Nations International Refugee Organization ("IRO"), *opened for signature* December 15, 1946, 62 Stat. 3037, 3051–52, T.I.A.S. No. 1846. As to the issues of misrepresentation and illegal procurement, we affirm.

Additionally, Sokolov makes evidentiary arguments to the effect (1) that he should have had access to certain documents in his immigration file both for preparation before trial and in connection with the cross-examination of a Government witness; (2) that copies of *Rech* should not have been admitted into evidence; and (3) that the district court improperly amended its conclusions of law by substituting the phrase "clear and convincing evidence" for "preponderance of the evidence" as the standard by which the court found for the Government. As to the first of these evidentiary points, we reverse and remand for in camera scrutiny by the trial court of the immigration file, but as to the other points, we affirm.

## I. BACKGROUND

### A. *Sokolov's Background*

Sokolov was born in 1913 in Orel, Russia, a city approximately 200 miles south of Moscow. Before World War II and for 14

Federal Circuit, sitting by designation.

months after the June 1941 German invasion of the Soviet Union he lived and worked near Voronezh. In August 1942, however, he returned to Orel, which was under German occupation, and applied for employment as a writer for the Russian-language newspaper *Rech*. *Rech* was at the time controlled by the German Army Panzer Propaganda Company 693. It was published three times weekly with at least 50,000 copies being distributed. Its purpose was to spread Nazi propaganda to the people living in occupied Soviet territory. By his own admission, Sokolov wrote articles for *Rech* "on the Jewish question" because if he did not do so he would "be thrown out and then ... liquidated." He also "had to" write articles against the nations fighting Nazi Germany, and others encouraging Russians to volunteer for work in Germany. As an employee of *Rech*, Sokolov received a weekly salary and also obtained preferential treatment in housing and food supplies for his family. He was so successful at his job that the Germans awarded him medals for "Bravery" and "Merit" in March and April, 1943, and he was promoted to deputy chief editor of the newspaper.

When the German army retreated westward in the late summer of 1943, the editorial personnel of *Rech*, including Sokolov, became attached to Propaganda Company 612 and were relocated to the cities of Bryansk and Bobruisk in Nazi-occupied Soviet territory. In the fall of 1944 Sokolov followed the retreat of the German army to Germany and until the end of the war he was employed in Berlin as a writer for the German-controlled Russian-language propaganda newspapers *Zarya* ("Dawn") and *Volya Naroda* ("Will of the People"). These newspapers, like *Rech*, published attacks on the Jews and exhortations to the Soviet people to support Nazi Germany against the Allies.

### B. *Sokolov's Writings*

The district court noted that each of the seventeen articles produced in evidence bearing Samarin's by-line "contains vicious attacks on Jews." Examples from two of them will suffice to portray the type of material for which Sokolov bears responsibility. The first, dated May 30, 1943, appearing in *Rech* No. 61 (244), is entitled "The Former Masters of Orel." This article pictures the "Kikes" as "the true masters" of the USSR, who "did not work," "hid in the shadows," but "made the decisions." This was true all over the USSR: "Kikes were masters of every institution, every city, the whole country." Sokolov complains that "[i]f in a city the Kikes made up 10% of the inhabitants, then they were 90% of the 'responsible persons.'" He speaks of the head in Orel of the Narodnyi Komissariat Vnutrennikh Del ("NKVD"), the Russian Security Police, as one and then names others who were in the Soviet hierarchy running Orel. Altogether, Sokolov names forty-seven Jews in positions of responsibility, and at the end of his article he exhorts his readers to "Thrash them."

On June 20, 1943, in *Rech* No. 70 (253), again under the Samarin by-line, Sokolov wrote "Protocols of the Elders of Zion," an article about the Russian translation of a book purporting to lift the veil on "the shady affairs of world Jewry." Sokolov first reminds the reader of the "Jewish threat" and of the Jews' move toward "world domination" by "seizing first economic and then political power." Then, after recounting the "Protocols," supposed Jewish goals and methods for achieving them, he says that much that is found in them "was realized and instituted in the Kikes' state—the USSR," and refers to Stalin as being "on the throne, on the Kike throne, placed there by Kikes and by their servants on top of the bones of millions of Russians." Sokolov speaks of war being "provoked against Germany" because of "a great deal of hatred from world Jewry towards Germany," and says that in this war "Kike-Bolshevism united with the capitalist countries England and America," because "in the USSR, England and America, Kikes are in power."

At trial Sokolov testified that whereas he had used the word "Jews," this was changed by his editor to "Kikes" toward the end of the "Protocols" article, and in-

deed that at the very end of the article a certain amount of new material was added. Nevertheless, he admitted having written an article on the subject of the "Protocols." The district court stated that Sokolov's "republication of 'The Protocols of the Elders of Zion' by his explanation [of them] compounds the insult." As to his article on "The Masters of Orel," Sokolov agreed that it was anti-Semitic, but he did not agree that its purpose and intent was to encourage hatred for the 47 people named because "they were not there any more." Sokolov also testified that the names were inserted and, indeed, that he could not recognize a single paragraph of the piece because everything was "written over."

The district court gave credence, however, to the videotaped testimony of Artur Bay, a corporal in the German army, attached to Panzer Propaganda Company 693 and Sokolov's superior at *Rech*. Bay testified that the main propaganda theme routinely published in *Rech* was the fight against "Jewish Bolshevism." As a *Rech* writer, he testified, "[y]ou should not say 'Bolshevism,' but you should also use the name 'Jewish Bolshevism.' That was propaganda for the Nazi ideology." *Rech* writers' propaganda "should prove that the Bolshevism was led by the Jews' world force." They were also to refer to the western Allies as the "Jewish plutocracy." Bay gave evidence as to Sokolov's application to work for *Rech* as a writer. He stated that before a person could join the writing staff, he had to be checked by the Abwehr (German intelligence). One requirement for writers was that they "be convinced Nazis, that they follow the ideas of the Nazis, that they were convinced anti-Bolsheviks, and the main point was the Jewish Bolshevism." Finally, Bay testified as to Sokolov's work at *Rech*. He said that he had been "satisfied" with Sokolov's writing: it conformed to what was expected of the *Rech* writers. Sokolov "wrote anti-Semitic articles, of course, because that was expected from him, like from all the other co-workers," and he never stated that he did not wish to write anti-Semitic articles, though indeed if he had he would have run into trouble. Sokolov also wrote articles on the theme of how good everything was in Germany, Bay testified, and in particular articles describing how good the Russian workers had it in Germany.

### C. Sokolov's Immigration to the United States and Naturalization as a United States Citizen

The DPA enabled European refugees to emigrate to the United States without regard to previous immigration quotas. Section 2(b) of the DPA, 62 Stat. at 1009, incorporated the definition of "refugees or displaced persons" contained in the Constitution of the IRO, a constitution ratified by the United States. *See Fedorenko*, 449 U.S. at 495 nn. 3 & 4, 101 S.Ct. at 741 nn. 3 & 4. Section 10 of the DPA, 62 Stat. at 1013, placed the burden of proving eligibility under the Act on the person seeking admission and provided that "[a]ny person who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person shall thereafter not be admissible into the United States." *See Fedorenko*, 449 U.S. at 495, 101 S.Ct. at 741.

Pursuant to procedures established under the DPA, each applicant for admission was interviewed first by representatives of the IRO in order to ascertain that the person was indeed a refugee or displaced person. By the terms of the IRO Constitution, war criminals, quislings, and traitors were ineligible for refugee or displaced person status, as were persons who could be shown "(a) to have assisted the enemy in persecuting civil populations of countries, Members of the United Nations; or (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in their operations against the United Nations." Annex I, Part II, 62 Stat. at 3051–52 (footnote omitted); *see Fedorenko*, 449 U.S. at 495 n. 4, 101 S.Ct. at 741 n. 4. An ineligible person was considered to be not "of concern" to the IRO, and an applicant not "of concern" to the IRO was ineligible for a United States visa under DPA § 2(b). If a person was found to be "of concern" to the IRO, on the other hand, he or she could then apply for a visa as a displaced person.

A preliminary determination on the issuance of a visa was made by an official of the Displaced Persons Commission (the "DPC") after an interview with the applicant. Final decision was made by one of a number of State Department vice consuls who were specially trained for the task and sent to Europe to administer the DPA. *See Fedorenko,* 449 U.S. at 495–96, 101 S.Ct. at 741–42. The visa applicant's screening was often done, however, by young army personnel given very short training before being sent to interview the alleged displaced persons. *See* L. Dinnerstein, *America and the Survivors of the Holocaust* 193 (1982); A. Ryan, *Quiet Neighbors: Prosecuting Nazi War Criminals in America* 22–23 (1984).

On May 21, 1951, Sokolov filed an Application for Immigration Visa and Alien Registration, Foreign Service Form 256A, at the State Department consular office in Wentorf, Germany, having cleared the IRO and DPC processes. There was expert testimony at trial from Henry Heymann, the State Department officer-in-charge of the consular program at the displaced persons camp at Wentorf, that in order to establish the eligibility of visa applicants under sections 2(b) and 13 of the DPA, vice consuls routinely inquired whether they had advocated or assisted in persecution or had voluntarily assisted the Nazi war effort.[1] In any event, Sokolov received his immigration visa on the day he filed his application. He was admitted to the United States on June 27, 1951, after signing an affidavit filed with the Immigration and Naturalization Service (the "INS") to the effect that he had never been a member of an organization designated by the Attorney General as communist, had never "participated in any movement which is or has been hostile to the United States or the form of the

government of the United States," and had "never advocated or assisted in the persecution of any person because of race, religion or national origin."

In order to be naturalized as a United States citizen, one has to be lawfully admitted for permanent residence, be of good moral character, be attached to the principles of the Constitution of the United States, and be well disposed towards the good order and happiness of the United States. 8 U.S.C. § 1427(a) (1982). A person who gives false testimony for the purpose of obtaining INA benefits is defined as not of good moral character in 8 U.S.C. § 1101(f)(6). Application for citizenship is made to the INS by filing an Application to File Petition for Naturalization and a biographic information sheet, together comprising INS Form N–400, which is signed under oath by the applicant. The naturalization examiner then reviews the alien's immigration file, including his displaced person report, his visa application, and the Form N–400, and prepares a Petition for Naturalization, Form N–405, which again is signed under oath by the applicant. At that point, if concerns still exist regarding an applicant's eligibility, INS investigators are requested to conduct a further investigation.

Sokolov submitted his Form N–400 to the INS in 1956, swearing, inter alia, that he had not given false testimony for the purpose of obtaining any benefit under the immigration and naturalization laws. He executed Form N–405 on October 17, 1956, swearing to the truth of the contents of the form and asserting that he was a person of good moral character attached to the principles of the Constitution of the United States and well disposed to the good order and happiness of the United States. On the Form N–405, however, the naturaliza-

---

1. His testimony was also that any writer and editor of a Nazi propaganda newspaper who had written anti-Semitic, anti-Allies, and pro-German articles would have been denied a visa as a routine matter, and that if an applicant had misrepresented and concealed these activities there would have been additional grounds for denial under section 10 of the DPA. Michael Thomas, the chief eligibility officer of the IRO and coauthor of the eligibility manual, and Ger-

ald Sophar, case analyst for the DPC in Wentorf, testified as to the IRO and DPC stages of Sokolov's visa application. Heymann, Thomas, and Sophar had not themselves interviewed Sokolov at Wentorf, or processed his applications. Evidently, the IRO, DPC, and vice consular officials who interviewed Sokolov in Germany could not be found or were deceased at the time of trial, which was 35 years after Sokolov filed his application for a visa.

tion examiner authorized a further investigation on the basis of a June 12, 1951, CIA memorandum to the effect that one Vladimir Sokolov had been an intelligence officer attached to the NKVD. The INS investigator obtained an FBI report that stated that an informant had told the FBI that Sokolov had worked for *Rech*, was pro-Fascist, and in the informant's opinion had collaborated with the Gestapo. The report noted, however, that the informant at one point said he had a personal grudge against Sokolov.

After receiving the FBI report, the INS investigator questioned Sokolov about his wartime activities. Sokolov admitted during his interview that he had been employed by *Rech* as the "Literary Editor of the paper and then the Deputy Editor" during the period when Orel was under German occupation. He stated that his duties as literary editor were as "corrector and proofreader of the paper from the grammatical point of view," and that he also wrote articles against the communists. The crucial question in the interview was as follows:

> How do you account for the fact that this service has information that the newspaper *Rech* was pro-Fascist and anti-Semitic and that you had similar views?

He gave the following answer:

> This is not true. Under German occupation there were many Russian papers and periodicals published under the dictatorship of the German occupational powers and we were forced to assume certain political line. We Russians fought this the best way we could but under the ever present danger of being shot to death on the spot, we had to put in remarks Fascist and Anti-Semitic to please the Germans but we fought against the Fascist line. This was the general policy of all Russian papers there. While this was the general political line of all these papers there, the Editor-in-Chief dictated the political line of the particular paper *Rech* in which I worked. Personally, I confined myself to anti-communist articles. I have not written one single fascist or pro-fascist line and as to anti-Semitic remarks, there

may have been some to which I was forced.

The examiner then asked, "Who forced you to make anti-Semitic remarks?" and was given the reply, "The entire German Censorship." The next question was, "Outside of being forced by the German authorities to make anti-Semitic remarks, have you ever personally been anti-Semitic and have you ever personally been pro-fascist?" Sokolov answered that he had not. He also answered "No" to the questions "Have you ever collaborated with the German Gestapo or with the German Army?" and "Were you ever instrumental in having anyone in Orel, Russia, or in any other place sent to a German Concentration Camp?"

The INS investigator chose not to credit the FBI informant's statements, as did the naturalization examiner who proceeded to recommend Sokolov for naturalization. Neither had access to the copies of *Rech* that are in our record.

### D. *Post-Naturalization Events*

Sporadic, disorganized, and for the most part unsuccessful efforts by the INS to deport or denaturalize alleged Nazi collaborators culminated in a 1978 General Accounting Office investigation. *See* A. Ryan, *Quiet Neighbors, supra,* ch. 2. At the insistence of the House Immigration Subcommittee, the Office of Special Investigations (the "OSI") was then formed in the Criminal Division of the Justice Department to bring civil denaturalization and deportation proceedings against Nazi collaborators. Since then, a number of such cases have been pursued, many of them successfully. *See* Massey, *Individual Responsibility for Assisting the Nazis in Persecuting Civilians,* 71 Minn.L.Rev. 97, 119–36 (1986). The present action was instituted by OSI and assigned to the United States Attorney for the District of Connecticut. The complaint was in eight counts. Counts I–V alleged that Sokolov had illegally procured citizenship under section 340(a) of the INA, 8 U.S.C. § 1451(a), because he had not entered the United States under a valid visa, as required by section 316(a)(1) of the INA, 8 U.S.C. § 1427(a)(1).

Count I alleged Sokolov was ineligible to receive a visa under section 13 of the DPA because he had advocated or assisted in persecution; Count II that he was ineligible as not being "of concern" to the IRO by reason of having assisted in persecution; Count III that he was ineligible under section 13 of the DPA because he had been a member of or had participated in a movement hostile to the United States; Count IV that he was ineligible as not being "of concern" to the IRO by reason of his having voluntarily assisted the enemy forces; and Count V that he was ineligible under section 10 of the DPA because he had made willful misrepresentations in the course of gaining admission to the United States. Counts VI and VII of the complaint alleged that Sokolov was not a person of good moral character as required for naturalization by section 316(a)(3) of the INA, 8 U.S.C. § 1427(a)(3), because he advocated or assisted in the persecution of Jewish civilians and gave false testimony to obtain his visa and citizenship. Finally, Count VIII alleged that Sokolov concealed or willfully misrepresented material facts in the course of procuring his visa and his naturalization.

The district court, without spelling out the count pursuant to which it was making its findings, found that the Government proved by clear, unequivocal and convincing evidence[2] that Sokolov procured both his visa and certificate of naturalization illegally and by means of misrepresentation of material facts. Accordingly, the district court entered judgment for the Government, vacating the order of the United States District Court for the Eastern District of New York that granted appellant citizenship and cancelling his certificate of naturalization.

## II.  DISCUSSION

### A.  *Misrepresentation*

Appellant argues that the district court erred in finding that the Government proved by clear, unequivocal, and convincing evidence that he had made material misrepresentations in the course of procuring his visa and his naturalization.

■ As to Sokolov's visa application, we agree that the Government failed to prove by the *Fedorenko* standard that appellant made material misrepresentations. Gerald Sophar, a DPC case analyst in Wentorf, testified that the DPC investigated the background of visa applicants. Investigators, he said, questioned applicants about their wartime activities, and asked if the applicant had assisted in persecution or had voluntarily assisted enemy forces. Answers to these questions, Sophar testified, would have been included in the DPC investigator's report and in the DPC case analyst's review of the application. In particular, if an applicant had revealed to the DPC that he had been a writer or editor for a Russian-language newspaper in occupied territory, this would have been included in the DPC report. Nevertheless, as the district court noted, there was "no evidence . . . of the actual interview with Sokolov." Nor was there, for example, evidence that DFC officials were required to and always did ask particular questions of applicants. The evidence that the Government developed at trial was not sufficiently probative of the questions Sokolov was asked or the answers he gave during his DPC interview to meet the strict *Fedorenko* standard of clear and convincing evidence of misrepresentation. The Government argues that the DPC report shows Sokolov told DPC officials he was a "corrector" at Orel, Bobruisk, and Berlin, and that any case analyst who had seen the word "corrector" would have called for a further investigation of the applicant. It asks that we infer from the absence of more details about Sokolov's wartime employment in the report that he must have made misrepresentations in the course of these further investigations. The Government would have us assume a regularity in the conduct and content of DPC interviews for which there is inadequate support in the record. The

**2.** The district court's opinion originally here stated that the standard satisfied was "a fair preponderance of the evidence," but on the Government's motion the opinion was amended to find the higher standard of proof mandated by *Fedorenko* to have been satisfied.

inference it would have us make would be little short of mere conjecture, and a far cry from the clear, unequivocal evidence of misrepresentation that *Fedorenko* demands.

The Government's evidence in connection with Sokolov's application for an immigration visa and alien registration at the State Department consular office in Wentorf is similarly flawed. Henry Heymann, the officer-in-charge of the consular program at Wentorf, testified that the vice consul interviewing a visa applicant would have asked questions about the applicant's wartime activities, that it would have been "logical" for the vice consul to ask whether the applicant had in fact assisted in persecution or had voluntarily assisted enemy forces during the war, and that vice consuls "very often" asked whether the alien had participated in movements hostile to the United States during the war. Heymann also testified that the information about Sokolov's wartime residences on his visa application would have caused further questioning by the vice consul, because it appeared from this information that Sokolov was in German-occupied territory and "was going westward as the German army retreated westward." This testimony is certainly admissible under *Fedorenko*, 449 U.S. at 510–11, 101 S.Ct. at 749–50. But because it is so speculative, it is insufficiently probative to meet the *Fedorenko* standard of proof. We do not know whether in fact Sokolov was asked all, or indeed any, of these questions—only that the questions were "logical" and "very often" asked. Because the Government's proof falls short of meeting the *Fedorenko* standard, we decline to infer from the absence of statements on his visa application that Sokolov misrepresented his participation in writing and editing anti-Semitic and pro-Nazi articles for a propaganda publication.

We turn now to the evidence that Sokolov made material misrepresentations when he applied for naturalization. The record includes a transcript of Sokolov's INS interview. The Government claims that Sokolov "concealed the nature and sponsorship of" *Rech* during this interview. But he was not directly asked who sponsored

*Rech.* Furthermore, he did say that "[u]nder German occupation there were many Russian papers and periodicals published under the dictatorship of the German occupational powers." He also said that "the Editor-in-Chief dictated the political line of the particular paper *Rech* in which I worked." The Government argues too that Sokolov "denied that he had voluntarily written any pro-Fascist or anti-Semitic articles." But he did admit that "there may have been some [anti-Semitic remarks] to which I was forced [by] [t]he entire German Censorship." This appears to be at worst a half-truth, since Sokolov, once he did work for *Rech,* was indeed required to make anti-Semitic remarks, as testified to by Artur Bay. Although Sokolov's statement no doubt was misleading, we are reminded by *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), that an unresponsive answer that is literally true but arguably misleading by negative implication, even if intentionally given in place of the responsive answer called for by a proper question, is not punishable under a perjury statute making it an offense for a witness willfully to state "any material matter which he does not believe to be true."

■ Sokolov did, however, tell the INS investigator that he had "not written one single fascist or pro-fascist line." This statement is not subject to construction, and it is a misrepresentation. The evidence shows Sokolov's articles followed the Nazi propaganda line. This propaganda line, Sokolov agreed, consisted of two basic themes: "namely that the German Army liberated the Russian people and two, that Jews caused all the sufferings of the Russian people." Sokolov was requested to follow this line in his work for *Rech.* He conceded under examination by Government counsel that he had been given "written material from the German Army propaganda apparatus to use as a guide in the articles [he was] to write." It was his "job to take this material and make it more understandable for Russian readers of *Rech.*" In doing so, he "wrote articles

against the allies and against the Jews," though he said he did this "[u]nder orders."

The "fascist or pro-fascist" nature of Sokolov's writings is clear from the copies of *Rech* that are in evidence. His article "On Your Own Land" is an example of propaganda to the effect that the Nazis had "liberated" the Russian peasantry. He wrote, "The Great Germany Army, which has brought the people liberation from the Judeo-Bolshevik yoke, has given the peasantry something they could not even dream about under the Bolshevik regime—land." In the same piece he said, "The transfer of land into the hands of the peasantry and the new life of the Russian peasant are inextricably linked now with the New Order, with Germany and with its Army." Examples of propaganda to the effect that Jews had been responsible for the suffering of the Russian people have already been noted in the discussion of Sokolov's articles entitled "The Former Masters of Orel" and "Protocols of the Elders of Zion." In another article, "Liberation Struggle," Sokolov wrote:

> On one side are the people of Europe headed by National Socialist Germany in league with the great Oriental power—Japan. On the other side is the bloc of plutocracy and bolshevism. The world is divided into two parts. Germany and its allies constitute a force that is encharged with bringing order and justice to mankind.
>
> . . . .
>
> The current war was prepared and provoked by Jewry, which already had brought so much suffering to mankind through the centuries.

■ The evidence shows, then, that Sokolov had wartime employment with *Rech* as a German army propagandist. If the INS investigator had discovered this fact, Sokolov would not have been eligible for naturalization. Sokolov's misrepresentation to the investigator, that he had "not written one single fascist or pro-fascist line," was therefore highly material. A fact concealed by an alien during the immigration and naturalization process is material if its admission would have occasioned either (1) the denial of naturalization or (2) an investigation potentially leading to the discovery of other facts warranting denial of citizenship. *See Chaunt v. United States*, 364 U.S. 350, 355, 81 S.Ct. 147, 150, 5 L.Ed.2d 120 (1960); *Maikovskis v. INS*, 773 F.2d 435, 440–42 (2d Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986) (in deportation case, materiality of misrepresentation is established when the investigation "probably would have" led to the discovery of facts warranting denial of a visa). Material misrepresentations at naturalization will result in denaturalization under section 340(a) of the INA, 8 U.S.C. § 1451(a). *See United States v. Schellong*, 717 F.2d 329, 333–35 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984). Sokolov, having been given a special investigative interview, proceeded willfully to misrepresent and conceal the truth, thereby disentitling him from remaining a citizen.

**B.** *Illegal Procurement*

■ There is a second, independent ground for our decision that Sokolov should be denaturalized: he was ineligible for citizenship and illegally procured it. "Citizenship is illegally procured any time the applicant has failed to comply with any of 'the congressionally imposed prerequisites to the acquisition of citizenship.'" *United States v. Sprogis*, 763 F.2d at 117 n. 2, quoting *Fedorenko v. United States*, 449 U.S. at 506, 101 S.Ct. at 747. One of these prerequisites is that the person seeking naturalization have been "lawfully admitted for permanent residence," in other words, have a valid visa. 8 U.S.C. § 1427(a)(1). For appellant's visa to have been valid, he had to have been eligible to receive a visa under the DPA. As we have recounted, the DPA made eligible for a visa only persons who could show that they were "of concern" to the IRO, DPA §§ 2(b), 10, 62 Stat. at 1009, 1013. Specifically not of concern to the IRO were "[a]ny ... persons who can be shown: (a) to have assisted the enemy in persecuting civil populations of countries ... or (b) to have voluntarily assisted the enemy forces since the outbreak of the second world war in

their operations against the United Nations." Constitution of the IRO, *supra*, 62 Stat. at 3051–52 (footnote omitted). Furthermore, the DPA itself made ineligible for a visa "any person who is or has been a member of or participated in any movement which is or has been hostile to the United States or ... who advocated or assisted in the persecution of any person because of race, religion, or national origin," DPA § 13, 64 Stat. at 227, or any person "who shall willfully make a misrepresentation for the purpose of gaining admission into the United States as an eligible displaced person," DPA § 10, 62 Stat. at 1013.

The Government has a heavy burden of proving illegal procurement, *see Sprogis*, 763 F.2d at 121, but in this case it has met its burden. It has shown that Sokolov was ineligible for a visa, and hence procured his citizenship illegally, because he had advocated or assisted in the persecution of Jews and had assisted enemy forces in their operations against the allies. Webster's Dictionary defines "persecution" as "the infliction of sufferings, harm, or death on those who differ ... in a way regarded as offensive or meriting extirpation," and as "a campaign having for its object the subjugation or extirpation of the adherents of a religion." The Government has shown that Sokolov's work as a German army propagandist involved his "advocating or assisting" in the persecution of Jews in the large area served by *Rech*. Although there was no showing of actual persecution of Jews in the Orel area resulting from these articles, it is plain on the face of DPA § 13 that advocating persecution in itself renders a person ineligible for a visa. In any case, such propaganda does assist persecution by creating a climate of opinion in which such persecution is acceptable. Professor Robert Herzstein, an expert on Nazi propaganda, testified that a purpose of propaganda was to make "Germany's political policies acceptable for German purposes in areas dominated by German military and political institutions." Articles such as Sokolov's "conditioned the Russian people into accepting and carrying out the National Socialist Policy in regards to the Jews,"

a policy of persecution. Though Nazi security police declared Orel "Judenfrei" in late 1941, Herzstein testified that other reports from the same source indicated Jews were active in the forests. This evidence suggests that there were still Jews in the Orel area, whose persecution Sokolov may have encouraged or assisted by his articles.

Sokolov, it is true, alleges that anti-Semitic passages were added to his articles by his editor, and that he "was forced to stay and accept the changes being made ... because if he refused, he would be dead or sent to a concentration camp." But the district court credited the testimony of Artur Bay that to get a job at *Rech* a person had to be a convinced opponent of "Jewish bolshevism," and that Sokolov "naturally ... wrote anti-Semitic articles, of course, because that was expected from him, like from all other co-workers." The district court found Bay to be a trustworthy witness, and his testimony supports a finding that Sokolov voluntarily wrote anti-Semitic articles for *Rech*, "thereby advocating or assisting in the persecution of Jews".

Sokolov illegally procured citizenship, too, because he was ineligible twice over for a visa by reason of having written, as stated above, pro-Nazi and anti-Allies articles. First, he was ineligible for a visa because his articles "assisted enemy forces" in the war with the Allies, so that he was not "of concern" to the IRO. Second, the articles amounted to a participation in a "movement ... hostile to the United States," so that he was ineligible for a visa under DPA § 13.

### C. *Evidentiary Matters*

Appellant also raises three evidentiary matters. He argues, first, that the district court should have ordered the Government to produce his immigration file, known as an "A-file," so that a government witness, Immigration Judge Howard I. Cohen, could be cross-examined on its contents. Judge Cohen testified that an applicant for naturalization filed a form N-400, an application for a petition to file for naturalization,

and that the clerk processing that form would immediately obtain the alien's A-file. The A-file included the alien's original visa and its attachments, which in the case of a displaced person usually included the DPC report, the alien's biographical statement, and his affidavit as to membership in subversive organizations or movements. The A-file would be available to the naturalization examiner at the time the applicant was interviewed.

Judge Cohen testified that the naturalization examiner who conducted Sokolov's interview called for a further investigation of Sokolov's background, and that this would have been normal practice when an examiner had a CIA report that the applicant had worked for the NKVD. Sokolov's A-file was forwarded to the investigations unit of the INS, which then made a written report. This report, together with the applicant's A-file, was returned to the naturalization examiner, who reviewed the report and found Sokolov eligible for naturalization. Finally, Judge Cohen was asked a series of hypotheticals pertaining to Sokolov's application for naturalization. He testified that if an applicant had revealed his authorship of pro-Axis and anti-Semitic articles, as an examiner he would either have denied naturalization or have asked for a further investigation.

■ On cross-examination Judge Cohen was asked whether he had ever seen Sokolov's original A-file, and he said that he had seen the file folder, but some documents had been removed from it. Clearly, then, he had seen at least part of the A-file. The cross-examiner asked the Government to produce the A-file for Judge Cohen so that he could question the witness with reference to its contents. The Government resisted and the court did not order that the A-file be produced. On appeal Sokolov claims that he had a right to the information in the file under the Privacy Act, 5 U.S.C. § 552a (1982), and also that his right to a thorough cross-examination under Fed. R.Evid. 612 was denied when materials Judge Cohen had used to refresh his memory before testifying were not produced in court. It is not clear from the transcript

exactly what documents Judge Cohen had used to refresh his memory. The Government claims that all responsive documents were produced pursuant to Sokolov's discovery request except those that were privileged, including some investigative materials. We, however, do not know whether this was the case, and have no way of knowing it absent in camera inspection of the A–file. On remand we order that the A-file be delivered to the district court for such an inspection. In the event any document appears to have been improperly withheld that might have proved of material significance in cross-examining Judge Cohen or otherwise, our remand will permit the district judge to reopen the case for purposes of such examination or for other purposes and on the basis thereof to modify his findings.

As to appellant's other arguments for production of the A-file, we note that the INS, pursuant to 5 U.S.C. § 552a(k)(2), has exempted A-files from Privacy Act disclosure, *see* 28 C.F.R. § 16.99(3) (1986). And, under the Freedom of Information Act, 5 U.S.C. § 552 (1982), the questioned material appears to be exempt from disclosure pursuant to subsections (b)(5) and (b)(7)(A). *See NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 149, 95 S.Ct. 1504, 1515, 44 L.Ed.2d 29 (1975).

■ Sokolov also argues that admission of copies of *Rech* from originals in Soviet archives was improper under Fed.R.Evid. 901(a) because of inconsistencies between one copy and its supposed original. The court accepted the Government's theory that the copy and original represented different editions of the same newspaper. Even if the exhibit concerned were ignored, however, it would not affect the result in this case.

■ At the end of the district court's initial opinion it stated that the Government had proven its case by a fair preponderance of the evidence. This statement was erroneous under the *Fedorenko* standard, however, which the district court itself had previously noted required "clear, unequivocal and convincing" evidence. Pursuant to a Government motion the

court amended its decision to conform to *Fedorenko.* Appellant argues that the district court erred in so amending its decision. We think, however, that the proof was by clear, unequivocal, and convincing evidence, and that the court had full power to amend its manifestly erroneous statement. *See Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986).

We have examined appellant's other contentions and find them to be without merit.

Judgment affirmed in part; case remanded for consideration by the court in camera of appellant's A-file.