

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-6-1995

# United States v Koreh

Precedential or Non-Precedential:

Docket 94-5408

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Koreh" (1995). *1995 Decisions.* Paper 183.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/183

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT


No. 94-5408


UNITED STATES OF AMERICA

v.

FERENC KOREH,
                    Appellant


On Appeal from the United States District Court
        for the District of New Jersey
        (D.C. Civil No. 89-cv-02544)



Argued:  February 28, 1995

Before:  SLOVITER, Chief Judge,
     NYGAARD and McKEE, Circuit Judges

(Filed July 6, 1995)


Judd Burstein    (Argued)
New York, New York  10022

        Attorney for Appellant

Susan L. Siegal (Argued)
Michael D. Bergman
United States Department of Justice
Office of Special Investigations
Washington, D.C.  20530

James B. Clark, III
Office of United States Attorney
Trenton, NJ  08608

        Attorneys for Appellee
        _____


OPINION OF THE COURT

_____

SLOVITER, Chief Judge.

Appellant Ferenc Koreh appeals from the district
court's order granting summary judgment to the United States on
three counts of its complaint revoking Koreh's naturalization and
requiring the return of his certificate of naturalization.  The
United States based its lawsuit on conduct by defendant of a
different order than the direct involvement in physical
atrocities that has characterized many other denaturalization
cases.  The legal principles, nonetheless, are equally
applicable.

I.

**Facts and Procedural History**

Koreh was born on September 4, 1909 in Sepsimagyaros,
Northern Transylvania, an area that moved between Romania and
Hungary but which was part of Hungary in 1940, when most of the
events relevant to this case began.  As did the district court we
rely only on facts that the parties do not dispute.[1]  Because the
relevant facts are set forth in detail in the district court's
comprehensive published opinion, see United States v. Koreh, 856
F. Supp. 891 (D. N.J. 1994), we repeat only those essential to
our holding.

_____

[1].  At the summary judgment stage a court must give the benefit
of all inferences to the non-moving party.  See Erie Telecomms.,
Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988).  In
order to determine which material facts are not in dispute, this
court conducts an independent review of the record.  See Bechtel

Hungary was the site of virulent anti-Semitism during the late 1930s and early 1940s. In 1938, shortly after Nazi Germany annexed Austria and established a common border with Hungary, the Hungarian Parliament passed its first major piece of anti-Semitic legislation. See Act No. XV of 1938 To More Effectively Safeguard the Balance of Social and Economic Life, Budapesti Közlöny, May 29, 1938, at 132-44; App. at 1620-52. The legislation limited the proportion of Jews that could be employed in the free professions (e.g. law, journalism, and the arts) and in business enterprises with ten or more employees. Id. at §§ 4, 7-8; App. at 1622-24. This legislation was followed in 1939 by a second law that attempted to define "Jewishness" in racial terms and implemented further social and economic restrictions upon Hungarian Jews. See Act No. IV of 1939 Concerning Limitations on the Economic and Political Expansion of Jews; App. at 1653-1706. This law prevented Jews from obtaining Hungarian citizenship, barred them from serving in public offices or holding significant positions in the press, and further reduced the proportion of Jews that could be employed in Hungarian businesses. Id. at §§ 3-21; App. at 1657-69.

In September 1940, as a result of an agreement between Hungary and Romania, Hungary annexed Northern Transylvania.

(..continued)
v. Robinson, 886 F.2d 644, 647 (3d Cir. 1989). Of course, a defendant's attempt to characterize undisputed facts or to put another spin on them does not constitute a genuine issue of material fact.

Immediately after the annexation, the anti-Semitic legislation that had been previously enacted by the Hungarian Parliament was applied to the approximately 164,000 Jews living in Northern Transylvania.  Under Hungarian law at the time, no newspaper could publish without a government license.  App. at 435.  In the fall of 1940, Koreh applied for and received a license from the Hungarian Prime Minister's office to publish Szekely Nep, a private daily newspaper in Northern Transylvania.

After obtaining the license, Koreh became the "Responsible Editor" of Szekely Nep.  The parties agree that Koreh served as Responsible Editor at Szekely Nep from January 18, 1941 to April 19, 1942; from approximately August 1, 1942 to August 29, 1942; and from October 24, 1942 to October 28, 1942.[2] There is no dispute that during these periods, approximately fifty-five anti-Semitic and/or anti-Allies articles appeared in the pages of Szekely Nep.  Fifty-one of those articles were unsigned.

Koreh has admitted that he was aware that the paper had to demonstrate an anti-Semitic profile to please the Germans and the Hungarian government.  Although Koreh's byline appeared on some of the anti-Semitic articles and the government produced evidence of his extensive involvement in editorial decisions,

---

[2].  Although Koreh held the position until November 1944, he contends that his tenure did not include the periods between these intervals or extend beyond October 28, 1942, and we will so assume for the purposes of this appeal.

referred to by the district court, Koreh disputes the government's contentions that his duties included writing, reading, editing and reviewing the paper's contents. At oral argument, counsel clarified Koreh's position as asserting that he wrote articles but not the anti-Semitic articles. For the purposes of summary judgment, the government accepts that Koreh did not write or edit any of these articles. There is no question, however, that the person holding the position of Responsible Editor on the masthead was criminally and civilly liable for all unsigned articles and for those for which the author was unavailable.[3] Moreover, Koreh concedes that he served as an emissary between the paper and the government.

> His testimony at deposition was as follows:
> Q:   Well, besides getting the license, then what did
>      you do at Szekely Nep?

---

[3]. The government contends Koreh told the staff what political direction the paper should take and what they could and could not publish. Although in his deposition Koreh made numerous statements suggesting that he did have input into the paper's editorial content, see App. at 735 (Q: You had to insure the political contents of the paper; is that correct? A: Yes, you can say so.), 738-39 (Q: How did you communicate; you just said you told people what they could and couldn't publish, didn't you? You are nodding, yes? . . . . Let the record reflect that Mr. Koreh is nodding affirmatively.), at other points in his deposition he minimized his involvement in the paper's editorial policies. See App. at 713, 722, 726-27. The government's expert evidence regarding the typical role of Responsible Editors in Hungary may provide a basis to challenge Koreh's credibility on this point, but such credibility determinations are inappropriate at the summary judgment stage. See Torre v. Casio, Inc., 42 F.3d 825, 835 (3d Cir. 1994). For purposes of this appeal, we will therefore assume that Koreh's input into the editorial process at the newspaper was minimal.

A:   Not too much.

Q:   My question --

A:   I was first man there, you know.

Q:   What does that mean, you were first man there?

A:   I was representing here and there. I went up to
     Budapest, I talked with politicians, with
     ministers, you know, about things how to behave,
     what to do, what kinds of articles they thought
     were useful, and so on, so, but I did not stay
     there, you know, to make the paper every day.

Q:   Are you saying that you were the person that the
     government told [what] had to be in the paper?

A:   No, but anyhow I talked very much with
     politicians, with other newspapermen, and about
     the whole situation. . . .

Q:   So you discussed political issues with people in
     Budapest?

A:   Certainly.

Q:   And you discussed articles that should appear in
     Szekely Nep in Budapest?

A:   No, we didn't discuss that.

See App. at 721-22 (emphasis added).


     Koreh does not challenge the characterizations of these
fifty-five articles as either "anti-Semitic" or "anti-Allies,"
nor could he, as made clear by an objective review of the
unsigned articles appearing in Szekely Nep during the period for
which Koreh was legally accountable for them to the Hungarian
government.  See, e.g., App. at 1141 (Oct. 2, 1941: emphasizing
the "alien-character" of the Jews in Hungary); App. at 1140

(Oct. 2, 1941: discussing "the Jewish question" in Hungary); App. at 1143 (Oct. 2, 1941: quoting a German publication which stated that "a final solution may be achieved only by deporting Jewish elements"); App. at 1190 (Oct. 31, 1941: referring to the works of Jewish writers as "highly undesirable 'literature'"); App. at 1312 (Jan. 29, 1942: stating that "Jews must not be permitted to plunder the people"); App. at 1473 (Aug. 12, 1942: referring to Jews as "the enemies of our race, who have stampeded over our bodies and continue to do so in their merciless plan to destroy Hungarians"); App. at 1416 (Apr. 11, 1942: "There are still others who say that we should not have harmed the Jews, but thank God, today we are beyond these types of sentimentality"); App. at 1515 (Aug. 29, 1942: attacking the author of a book questioning Hungarian anti-Jewish laws, and noting that the author "is certainly unaware of that part of the Holy Scriptures in which Jesus, the Lord, regarded Jewry not as his own race, but as a 'brood of vipers'").

Many of the articles published by Szekely Nep combined this anti-Semitic sentiment with anti-Allies rhetoric regarding World War II. See, e.g., App. at 1085 (July 24, 1941: discussing the "New York Jewish plan" to destroy Germany); App. at 1320 (Jan. 31, 1942: "The Role of Jewish Capital in the Present World War"); App. at 1328-30 (Feb. 15, 1942: article entitled "How the World's Jews Forced the American People to Go to War," which argued that "it was exclusively Jews who, by an irresponsible

representation of the facts, have incited the American people to wage war against Japan"); App. at 1330 (Feb. 15, 1942: referring to "President Roosevelt and the Jewish clique behind him," and stating that "the Jews believe that they, as 'the chosen people,' are destined to rule over all the other peoples of the earth, and therefore they are willing to use any means to achieve this end"); App. at 1321 (Jan. 31, 1942: discussing an alleged plan for "Jewish world hegemony"); App at 1353 (Mar. 18, 1942: "Washington, London and Moscow are waging a war in order to establish Jewish world domination").

In addition, Szekely Nep frequently coupled its strong anti-Semitic tone with statements supporting or encouraging the Hungarian government's steps to enact or to enforce various anti-Jewish measures. See, e.g., App. at 1402 (Apr. 9, 1942: demanding that the Hungarian government "send the Jews packing from the homes they continue to arrogantly occupy even today"); App. at 1115 (Aug. 29, 1941: "[I]n particular in the field of commerce, we strive to permit the Jews the smallest possible room to act, and to encourage Hungarian commerce to expand"); App. at 1416-17 (Apr. 11, 1942: calling for stricter rules against Jews "in the areas of housing and purchasing"); App. at 1472 (Aug. 12, 1942: calling for the "purification" of Hungarians through stricter enforcement of laws against those who serve as front men for Jewish business owners); App. at 1486 (Aug. 14, 1942: referring to Jews as "elements harboring alien interests and

driven by the desire of self-enrichment," and calling for legal reform); App. at 1492 (Aug. 20, 1942: blaming Jews for the overcrowding on trains and buses and applauding efforts taken by the government to limit Jewish use of sleeping cars).

In April 1941, the Hungarian Government enacted a decree requiring all Jewish males to serve in a Forced Labor Service to assist the Hungarian Army. The implementation of that decree between 1941 and 1944 led to the deaths of many Hungarian Jews who were forced to work behind Hungarian lines on the Eastern Front. Also in 1941, Hungary ordered and implemented a decree resulting in the deportation of between 17,000 and 18,000 Jews who were deemed "foreign" by the Hungarian government because they could not prove their Hungarian citizenship. These "foreign" Jews, many of whom were from Northern Transylvania, were deported to German-occupied Ukraine, where they were placed in the custody of members of the German Schutzstaffel ("SS") and subsequently executed.

In August 1941, the Hungarian Government enacted legislation copied from the Nazis barring marriages and sexual relations between Jews and non-Jews. See Act No. XV of 1941, Amending and Protecting the Matrimony Act; App. at 1707-38. The law contained provisions attempting to define Jewishness, and included criminal penalties to be applied to the participants and to any officials who oversaw such marriages.

In 1943, Koreh moved to Budapest and began working in the Royal Hungarian Ministry of National Defense and Propaganda. Koreh has admitted that he served as an officer in the Information Section of the Ministry in 1943 and 1944. See App. at 189, 345, 358. The Information Section was responsible for "monitoring of the country's public opinion and provision of accurate and objective information concerning matters of national interest to organizations and institutions which have a formative influence on public opinion." App. at 1590.

In March 1944, Nazi Germany occupied Hungary. Shortly thereafter, more than one hundred decrees related to Hungarian Jews were issued. These decrees included orders confiscating Jewish property, relocating Jews to ghettos, restricting Jewish movement and barring Jews from using public services. Finally, beginning in May 1944, the government began mass deportation of Hungarian Jews to German labor and concentration camps. Between May 1944 and July 8, 1944, approximately 435,000 Hungarian Jews were deported to Auschwitz death camp and other German labor and concentration camps.

After the German occupation of Hungary, Koreh assumed the role of Responsible Editor of the government-owned periodical Világlap. Koreh's responsibilities at Világlap included review of photographs and articles selected for publication and supervision of the editorial staff. In 1947, several years after the war ended, Koreh was convicted of a war crime for his role as

a Responsible Editor of Világlap by the People's Court of Hungary, and served seven months of his one-year sentence for the conviction in prison.[4]  In addition, he also spent additional time thereafter in a detention camp.

In 1950, Koreh applied for and received a visa to the United States under the Displaced Persons Act of 1948, Pub. L. No. 80-774, ch. 647, 62 Stat. 1009 (1948), as amended by Pub. L. No. 81-555, ch. 262, 64 Stat. 219 (1950) (the "DPA").  In connection with his application, Koreh signed an affidavit stating that he had never been a member of or participated in any movement which is or has been hostile to the United States, and that he had never advocated or assisted in the persecution of any person because of race, religion or national origin.  That affidavit was a prerequisite to the issuance of the visa and it is those facts that the government has challenged in this lawsuit.

On March 8, 1956, the United States District Court for the Eastern District of New York granted Koreh's petition for naturalization and issued to him Certificate of Naturalization No. 7516480.  In the ensuing years, Koreh has lived in the United States, where he has worked as a writer, translator and broadcaster for Radio Free Europe.  Koreh has also served as an

---

[4].  Koreh moved to expand the record in this court with material allegedly showing that conviction was recently overturned by the post-Communist government in Hungary, but because Koreh withdrew his motion after government objection we have no evidentiary basis for that assertion.

editor for various United States-based Hungarian publications, and has hosted a weekly radio program in New York City on Hungarian affairs.

In 1982, the government interviewed Koreh regarding his activities in Hungary during World War II.  At that time, Koreh told the government about his position with Szekely Nep during 1941-42, his subsequent position with Világlap, and his charge and conviction for war crimes in the People's Court of Hungary. Koreh had not revealed this information at the time he applied for his visa.

In June 1989, the United States filed a nine-count complaint against Koreh, later expanded to ten counts, seeking to revoke Koreh's naturalized citizenship pursuant to 8 U.S.C. § 1451(a), inter alia, as "illegally procured" on the basis of an invalid DPA visa.  The five counts relevant to this appeal allege that Koreh's DPA visa was invalid because (Count I) he had "assisted in the persecution" of Jews through his position at Szekely Nep, a fact which rendered Koreh ineligible for a visa under section 2(b) of the DPA; (Count II) he had "advocated and/or assisted in the persecution" of Jews through his position at Szekely Nep, a fact which rendered him ineligible for a visa under section 13 of the DPA; (Count III) he had been a member of or participated in "a movement hostile to the United States" through his employment as a Press Officer in the Press Department of the Hungarian Ministry of Propaganda in 1944, a fact which

rendered him ineligible for a visa under section 13 of the DPA; (Count IV) his employment with the Hungarian Ministry constituted "voluntary assistance" to enemy forces in their operations against the United Nations and he was therefore not a "concern of the International Refugee Organization," a fact which rendered Koreh ineligible for a visa under section 2(b) of the DPA; (Count X) he was a war criminal and was therefore not a "concern of the International Refugee Organization," a fact which rendered Koreh ineligible for a visa under section 2(b) of the DPA.[5]

The government's motion for summary judgment was based on those five counts and argued that the undisputed facts in the case supported the conclusion that Koreh illegally procured his citizenship. After hearing oral argument on the government's motion, the district court entered an order granting summary

---

[5] . In the remaining counts of the complaint, the government alleged (Count V) that Koreh's DPA visa was invalid under section 10 of the DPA because Koreh had advocated or acquiesced in activities contrary to civilization and human decency on behalf of the Axis nations during World War II; (Count VI) that Koreh unlawfully entered the United States by making willful misrepresentations to the Displaced Persons Commission and the United States Army Counter Intelligence Corps for the purpose of obtaining admission; (Count VII) that Koreh gave false testimony to Naturalization examiners and therefore was not a person of good moral character as defined in 8 U.S.C. § 1101(f)(6), and was therefore ineligible for naturalization under 8 U.S.C. § 1427(a)(3); (Count VIII) that Koreh's assistance in and advocacy of persecution of Jewish civilians in Hungary demonstrated that he was a not a person of good moral character and was therefore ineligible for naturalization under 8 U.S.C. § 1427(a)(3); and (Count IX) that Koreh illegally procured his citizenship by willfully concealing and misrepresenting material facts in his Application to File Petition for Naturalization and in his Petition for Naturalization.

judgment to the government on Counts I, II and III of the complaint. The district court concluded that Koreh's activities at Szekely Nep constituted "advocacy and assistance in persecution" rendering him ineligible for a DPA visa under both section 2(b) and section 13 of the DPA. With respect to count III, the district court concluded that Koreh's activities at Szekely Nep constituted membership and participation in a "movement hostile to the United States," rendering him ineligible for a visa under section 13 of the DPA. Because it held that these three counts were sufficient to support the government's denaturalization action, the district court declined to address the arguments presented by the government based on counts IV or X. Koreh now appeals the district court's grant of summary judgment to this court.

## II.

### Jurisdiction and Standard of Review

This court has jurisdiction over Koreh's appeal pursuant to 28 U.S.C. § 1291. We have plenary review over the district court's order granting summary judgment. Erie Telecomms., Inc. v. City of Erie, 853 F.2d 1084, 1093 (3d Cir. 1988).

We have previously noted the "two competing concerns" at issue in denaturalization cases, United States v. Breyer, 41 F.3d 884, 889 (3d Cir. 1994), which have an impact on our review. As acknowledged by the Supreme Court, "the right to acquire

American citizenship is a precious one, and . . . once citizenship has been acquired, its loss can have severe and unsettling consequences." Fedorenko v. United States, 449 U.S. 490, 505 (1981). Thus, the government "carries a heavy burden of proof in a proceeding to divest a naturalized citizen of his citizenship." Costello v. United States, 365 U.S. 265, 269 (1961). At the same time, however, courts require "strict compliance with all the congressionally imposed prerequisites to the acquisition of citizenship." Fedorenko, 449 U.S. at 506. These two factors combine to "reflect our consistent recognition of the importance of the issues at stake--for the citizen as well as the Government--in a denaturalization proceeding." Id. at 507.

### III.

### **Discussion**

Under Section 340(a) of the Immigration & Nationality Act of 1952, as amended, the government may seek the revocation of an order admitting a person to citizenship and the cancellation of that person's certificate of naturalization if such order and certificate "were illegally procured." 8 U.S.C § 1451(a). In order to legally obtain a naturalization order and certificate, an applicant must have resided in the United States for at least five years after having been "lawfully admitted for permanent residence." See 8 U.S.C. §§ 1427(a)(1), 1429. Lawful admission requires entry pursuant to a valid immigrant visa. See

Fedorenko, 449 U.S. at 515; Breyer, 41 F.3d at 889; United States v. Kowalchuk, 773 F.2d 488, 493 (3d Cir. 1985) (in banc), cert. denied, 475 U.S. 1012 (1986).

As noted above, Koreh entered the United States under a visa issued pursuant to the DPA. At the time of Koreh's application, a DPA visa was available only to persons of concern to the International Refugee Organization (IRO). DPA § 2(b), 62 Stat. at 1009. The IRO Constitution provided that persons "who can be shown to have assisted the enemy in persecuting civil populations of countries" are not persons "of concern" to the IRO. See Constitution of the International Refugee Organization, opened for signature Dec. 15, 1946, 62 Stat. 3037, 3051–52, T.I.A.S. No. 1846.

> In addition, section 13 of the DPA provided, in part: No visas shall be issued under the provisions of this Act . . . to any person who is or has been a member of or participant in any movement hostile to the United States or the form of government of the United States, or to any person who advocated or assisted in the persecution of any person because of race, religion, or natural origin.

DPA § 13, 64 Stat. at 227 (emphasis added). Thus, Koreh was not eligible for his DPA visa if, prior to his obtaining the visa, he (1) had "assisted the enemy in persecuting civil populations of countries" within the meaning of the IRO Constitution, (2) had "advocated or assisted in the persecution of any person because of race, religion, or natural origin" within the meaning of section 13 of the DPA, or (3) was or had been "a member of or

participant in a movement hostile to the United States or the form of government of the United States," within the meaning of section 13 of the DPA.

A.

### Assistance in Persecution

We first consider whether the undisputed facts support the district court's conclusion that Koreh "assisted in the persecution" of Hungarian Jews through his activities at Szekely Nep.[6]  In Fedorenko, the Supreme Court addressed the meaning of the term "assistance in persecution" with respect to the validity of a visa obtained under the DPA.  The Court held that an individual's service as a concentration camp guard constituted "assistance in persecution" even if that service was involuntary.  Id. at 512-13 n.34.  The Court recognized that "[o]ther cases may present more difficult line-drawing problems," and suggested that the proper focus is "on whether particular conduct can be considered assisting in the persecution of civilians."  Id. (emphasis in original).  It continued:

[6].  In this case, the district court saw no significant difference between the phrases "to have assisted the enemy in persecuting civil populations of countries" under the IRO Constitution and "assisted in the persecution of any person because of race, religion, or natural origin" under section 13 of the DPA.  See United States v. Breyer, 41 F.3d 884, 890 n.8 (3d Cir. 1994) (noting similar purpose behind the two provisions).  We agree that these two standards have the same meaning for the purposes of this case.  We note, however, that section 13 also barred the issuance of a DPA visa to persons who "advocated" persecution.  As discussed below, this "advocacy" standard provides an independent basis for affirming the district court's order.

Thus, an individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians. On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

Id.

We have read Fedorenko as describing a "continuum of conduct to guide the courts in deciding" how to apply the term "assistance in persecution." Breyer, 41 F.3d at 890. Thus, the term is to be applied on a case-by-case basis with reference to the relevant facts presented in each case.

In his brief, Koreh suggests that the mere publication of anti-Semitic articles in a private newspaper cannot constitute "assistance in persecution." In particular, Koreh states that he "challenge[s] the premise that propaganda assists persecution merely by creating 'a climate of opinion.'" Appellant's Brief at 47. He contends that the district court's conclusion that the publication of such propaganda necessarily assisted persecution of Hungarian Jews is based upon a theory of causation questionable under both tort and criminal law.

In making such a contention, Koreh overlooks that this case is not founded on causation theories of either tort or criminal law. The only issue is whether Koreh had satisfied the congressionally-imposed prerequisites for acquiring citizenship.

In any event, we unequivocally reject Koreh's

contention that the propaganda activities of Szekely Nep did not

"assist in the persecution" of Hungarian Jews.  It runs counter

to generations of history that attest to the maxim that the pen

is at least as mighty, if not mightier, than the sword.  That the

Nazi powers, and their cohorts, placed great confidence in the

power of the word is demonstrated by the emphasis they placed on

propaganda.  Indeed, in the Nuremberg trials in presenting the

charges against defendant Julius Streicher, publisher of an anti-

Semitic newspaper, the prosecution stated:

> It may be that this defendant is less directly
> involved in the physical commission of crimes
> against Jews.  The submission of the prosecution
> is that his crime is no less the worse for that
> reason.  No government in the world, before the
> Nazis came to power, could have embarked upon and
> put into effect a policy of mass extermination
> without having a people who would back them and
> support them.  It was to the task of educating
> people, of producing murderers, educating and
> poisoning them with hate, that Streicher set
> himself.  In the early days he was preaching
> persecution.  As persecution took place he
> preached extermination and annihilation; and, as
> we have seen in the ghettos of the East, as
> millions of Jews were being exterminated and
> annihilated, he cried out for more and more.
>
> That is the crime that he has committed.  It is
> the submission of the prosecution that he made
> these things possible--made these crimes possible-
> -which could never have happened had it not been
> for him and for those like him. . . .  The effect
> of this man's crimes, of the poison that he has
> injected into the minds of millions and millions
> of young boys and girls and young men and women
> lives on.  He leaves behind him a legacy of almost

> a whole people poisoned with hate, sadism, and
> murder, and perverted by him.

Robert E. Conot, Justice at Nuremberg 384-85 (1983)(emphasis added)(quoting from 5 International Military Tribunals (IMT), Trial of the Major War Criminals 118 (1987)).

When judgment was pronounced on Streicher, the War Crimes Court stated, "[T]his defendant continued to write and publish his propaganda of death. Streicher's incitement to murder and extermination at the time when the Jews in the East were being killed under the most horrible conditions clearly constitutes persecution on political and racial grounds in connection with war crimes, and constitutes a Crime Against Humanity." Id. at 496 (quoting from 1 IMT 304) (emphasis added). Although the underlying legal basis for the prosecution of Streicher differed from the basis for this denaturalization case against Koreh, the recognition of the nexus between propaganda and persecution is no less applicable for that reason.

In United States v. Sokolov, 814 F.2d 864 (2d Cir. 1987), cert. denied, 486 U.S. 1005 (1988), a case in which the court upheld an order of denaturalization because of the defendant's propaganda activities in writing pro-Nazi and anti-Allies articles, the Court of Appeals for the Second Circuit held that such propaganda activities clearly constituted advocating or assisting "in the persecution of the Jews within the meaning of section 13 of the DPA." Id. at 874. The court noted that Webster's Dictionary defines "'persecution'" as "'the infliction

of sufferings, harm, or death on those who differ . . . in a way regarded as offensive or meriting extirpation'" and as "'a campaign having for its object the subjugation or extirpation of the adherents of a religion.'" Id. The court stated that notwithstanding the lack of any showing of actual persecution of Jews resulting from Sokolov's articles, "such propaganda does assist persecution by creating a climate of opinion in which such persecution was acceptable," id., thereby facilitating their persecution. Thus it concluded that Sokolov, who had written several anti-Semitic articles in German-occupied Russia, "assisted persecution" by conditioning the Russian people into accepting and carrying out the German anti-Jewish policies. Id.

The Sokolov court's analysis is apt here. There is evidence that Szekely Nep played a prominent role in calling for Hungary's adoption of increasingly drastic anti-Jewish restrictions. During Koreh's tenure, Szekely Nep frequently advocated anti-Semitic legislation and enforcement actions that were more severe than those which had already been enacted by the Hungarian Parliament. Some of the measures supported by Szekely Nep during 1941 and 1942 were eventually enacted when the German government occupied Hungary in 1944.

There was ample basis in the undisputed facts for the district court to conclude that Koreh's involvement in the publication of anti-Semitic articles by Szekely Nep assisted in the persecution of Hungarian Jews by fostering a climate of anti-

Semitism in Northern Transylvania which conditioned the Hungarian public to acquiesce, to encourage, and to carry out the abominable anti-Semitic policies of the Hungarian government in the early 1940s.

B.

**Advocacy of Persecution**

Moreover, we note that under section 13 of the DPA Koreh was ineligible for a visa if he "advocated or assisted in the persecution of any person because of race, religion, or natural origin." See 64 Stat. at 227 (emphasis added). Such advocacy by Koreh provides an independent basis to affirm the district court's order of denaturalization.

There can be no dispute that the articles published in Szekely Nep during Koreh's tenure advocated the persecution of Hungarian Jews. Thus, even if Koreh were able to demonstrate that no actual persecution was caused by the articles published in Szekely Nep, he would still have been ineligible for a DPA visa under section 13 as in Sokolov for having advocated such persecution in the pages of Szekely Nep. Koreh does not contest that principle of law nor does he deny that Szekely Nep advocated such persecution. Instead he seeks to deflect the legal effect of the district court's factual and legal conclusions by disclaiming personal responsibility.

C.

**The "active and personal participation" argument**

Koreh's effort to avoid the inevitable conclusion to which the undisputed facts led the district court is principally concentrated in his argument that he "did not actively or personally commit any acts of oppression." Appellant's Brief at 22. The difficulty with Koreh's argument is that it would require us to rewrite the statute.

Koreh contends that in non-death camp cases courts should require a showing that a defendant personally participated in the acts of persecution. He notes that while courts have frequently found that armed concentration camp guards have "assisted in persecution" regardless of whether they personally committed any acts of oppression, see, e.g., Breyer, 41 F.3d at 890; United States v. Schmidt, 923 F.2d 1253, 1259 (7th Cir.), cert. denied, 502 U.S. 921 (1991), they have been reluctant to apply a similar standard in non-death camp cases. Thus, Koreh reasons, even if the anti-Semitic articles in Szekely Nep constitute "advocacy or assistance in persecution" of Hungarian Jews, the government must still demonstrate that he took an active role in the publication of those articles.

In support of his argument, Koreh relies heavily on United States v. Sprogis, 763 F.2d 115 (2d Cir. 1985). In Sprogis, the Court of Appeals for the Second Circuit affirmed a district court's dismissal of the government's denaturalization action on the ground that the government had presented insufficient evidence to support the conclusion that the

defendant had assisted in the persecution of Jews while serving as a policeman in Nazi-controlled Latvia.  The court stated that although the defendant had been present at the police station during the detention of nine Latvian Jews and had allowed their incarceration to continue, "these were not acts of oppression."

Id. at 122.  The Sprogis court continued:

> There is no clear evidence that he made any decision to single out any person for arrest and persecution or that he committed any hostile act against any persecuted civilian.  Sprogis' passive accommodation of the Nazis, like that of so many other civil servants similarly faced with the Nazis' conquest of their homelands and the horrors of World War II, does not, in our view, exclude him from citizenship under the DPA. To hold otherwise would require the condemnation as persecutors of all those who, with virtually no alternative, performed routine law enforcement functions during Nazi occupation.

Id. at 122-23.

While we might have drawn the line between "passive accommodation" and "assistance in persecution" differently than did the Sprogis court, we note that in a case shortly thereafter, Maikovskis v. INS, 773 F.2d 435 (2d Cir. 1985), cert. denied, 476 U.S. 1182 (1986), the same court sustained deportation of a former Latvian police chief who, on orders of the German authorities, had directed his police to assist the German soldiers in mass arrests and the burning of a village.  Id. at 438.  The court did not cite its own Sprogis decision decided earlier the same year.[7]

_____

[7]. The government argues, and the district court agreed, that Sprogis is not good law because the Second Circuit's decision in

The language in other denaturalization cases on which Koreh relies for his proposed "personal participation" requirement provides little persuasive precedent. In <u>United States v. Kairys</u>, 782 F.2d 1374 (7th Cir.), <u>cert. denied</u>, 476 U.S. 1153 (1986), the court affirmed a district court's order revoking the citizenship of a defendant who served as an armed guard at a Nazi labor camp in Poland. Thus the statement that "in cases not involving armed guards such as defendant, a showing of personal involvement in persecutions <u>may</u> be necessary," <u>id.</u> at 1378 (emphasis added), is not only dictum, but equivocal dictum at best.

Inexplicably, Koreh continuously refers to language in the dissenting opinion in <u>United States v. Kowalchuk</u>, 773 F.2d 488, 513 (3d Cir. 1985) (in banc), <u>cert. denied</u>, 475 U.S. 1012 (1986). This court, in banc, affirmed the order of denaturalization, concluding that the defendant was ineligible for a DPA visa because (1) he had voluntarily assisted enemy forces during World War II in their operations, and (2) he made willful material misrepresentations in his application for a DPA

(..continued)
<u>United States v. Sokolov</u>, 814 F.2d 864, 874 (2d Cir. 1987), <u>cert. denied</u>, 486 U.S. 1005 (1988) effectively rejected <u>Sprogis</u>. Koreh responds that because Sokolov "voluntarily wrote anti-Semitic articles," his role was different from Sprogis's role of "passive accommodation." We need not decide whether the cases are consistent because Koreh's conduct was more analogous to Sokolov's and, in any event, we find the analysis in <u>Sokolov</u> more persuasive.

visa.  Id. at 498.  Had this court been persuaded by the dissent's view, patently the outcome would have been different.

This is not a case in which the government bases its claim of "assistance in or advocacy of" persecution on Koreh's mere membership in an organization.  Thus again, the language in Laipenieks v. INS, 750 F.2d 1427 (9th Cir. 1985), where the court stated that under the Holtzman Amendment[8] the government must "provide proof of personal active assistance or participation in persecutorial acts before deportability may be established" rather than "mere acquiescence or membership in an organization," id. at 1431–32, was not made in a factually analogous situation.  The same is true of the dictum in Maikovskis, 773 F.2d at 446, where the court did uphold deportability, and in its discussion merely noted that "an alien's inactive membership in an organization bent on politically-based persecution" or "his tangential provision of services to such an organization" might be insufficient to support deportation.

Indeed, there is also dictum on Koreh's "personal participation" argument that goes in the other direction.  For example, in Schellong v. INS, 805 F.2d 655 (7th Cir. 1986), cert. denied, 481 U.S. 1004 (1987), another Holtzman Amendment case

_____

[8]. The Holtzman Amendment to the Immigration and Nationality Act permits deportation of any alien who, under the direction of or in association with the Nazi regime or any regime allied with it, "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion."  8 U.S.C. § 1182(a)(3)(E)(i).

upholding deportability, the Seventh Circuit explicitly rejected the requirement that personal, active involvement in the persecution is required to constitute "assistance in persecution."  The Schellong court noted that insofar as Sprogis and Laipenieks hold "that personal involvement in atrocities is necessary to have assisted in persecution for purposes of the DPA or the Holtzman Amendment, they conflict with Fedorenko."  Id. at 661.  The Schellong court, as did this court in Breyer, 41 F.3d at 890, and the Second Circuit in Maikovskis, 773 F.2d at 446-48, endorsed a more flexible rule, determining the nature of "assistance in persecution" on a case-by-case basis, as suggested in Fedorenko.  See 449 U.S. at 512-13 n.34.

        In any event, the only issue before us is whether the facts of this case support the conclusion that Koreh assisted in or advocated persecution of the Jews, the statutory standard. There need be no personal participation by the defendant in the commission of physical atrocities.

        Despite Koreh's contentions to the contrary, the undisputed facts of this case demonstrate that Koreh did, in fact, personally participate in the activities that are the subject of the government's denaturalization claim.  While the issue of Koreh's involvement in the editorial process at Szekely Nep remains in dispute, there is no dispute that Koreh sought and obtained from the Hungarian government the license to publish Szekely Nep.  That license, as Koreh concedes, was necessary

under Hungarian law to permit the newspaper to publish.  Indeed,
his act of obtaining and maintaining the license for Szekely Nep
enabled the publication of the newspaper to occur and ensured
that its anti-Semitic message would be carried throughout its
distribution area in Northern Transylvania.  Koreh's actions in
connection with the newspaper therefore cannot fairly be
characterized as one of "passive accommodation."  Rather, Koreh
took affirmative acts that were no less influential to the spread
of Szekely Nep's anti-Semitic message than the actions of those
who personally edited and wrote the articles that appeared in the
newspaper.  Thus, even if we were to require some degree of
active personal participation from defendants in non-death camp
cases, Koreh's undisputed actions in this case would satisfy that
requirement.  It would be ironic indeed were we to hold that some
mere writer were to have responsibility for the contents of the
propaganda spewed out month after month by Szekely Nep but that
someone without whom the paper could not be published can evade
such responsibility.  It is simply unacceptable to equate Koreh's
responsibility with that of a typesetter, as Koreh's counsel
sought to do at argument.

        We conclude that the undisputed facts of this case
demonstrate that Koreh's activities at Szekely Nep during 1941
and 1942 constituted both assistance in the persecution of
civilians under the IRO and the "advoca[cy] or assist[ance] in
the persecution of any persons because of race, religion, or

national origin" under section 13 of the DPA.  Koreh was therefore ineligible for a DPA visa, and his citizenship was thus "illegally procured" under 8 U.S.C. § 1451(a).

D.

### Movement Hostile

As an alternate basis for its grant of summary judgment, the district court determined that Koreh was also ineligible for a visa under section 13 of the DPA because his activities at Szekely Nep constituted membership and participation in a "movement hostile to the United States."  As precedent, the district court relied on two cases.  One was the Second Circuit's holding in Sokolov that Sokolov's writing anti-Semitic articles "amounted to a participation in a 'movement . . . hostile to the United States.'"  See 814 F.2d at 874.  The other was the district court's holding in Marschalko v. Shaughnessy, Civ. No. 63-138 (S.D.N.Y. Mar. 9, 1951), App. at 1775-86, approving the INS's conclusion that an individual who had been a writer for a semi-official publication of the Hungarian government during the war, and who wrote anti-American, anti-Semitic and pro-Nazi articles, was ineligible for a DPA visa because he had "participated in a movement. . . which was 'hostile to the United States.'"  App. at 1786.

Although the word "movement" may not ordinarily be associated with a newspaper, Koreh's argument does not stand on that technical ground, and the application of the word for

purposes of the relevant statute has been broad. Koreh argues instead that unlike the newspapers in Sokolov and Marschalko, which were directly affiliated with Axis governments,[9] Szekely Nep was a "civilian newspaper" and therefore it should not be deemed a "movement hostile to the United States" despite its anti-Allies political stance.[10]

However, the premise for the government's denaturalization claim is that Koreh was not eligible for DPA status, which was the basis of his visa. The government has produced uncontested evidence that during the early 1950s, when Koreh got his visa, the United States Displaced Persons Commission (DPC) frequently denied DPA status to persons associated with private and semi-private newspapers that had published anti-American propaganda in Axis nations during World War II because they were deemed members of movements "hostile to the United States." See, e.g., App. at 1613 (denying admission to editor of newspaper in Hungary during 1942 because "[t]he position . . . would necessitate support and compliance with the

---

[9]. In Sokolov, the paper was a publication directly controlled and operated by the German army. 814 F.2d at 867. In Marschalko, the paper was characterized as a "semi-official organ of the Hungarian government." App. at 1778.

[10]. In light of the articles referred to in the text supra, Koreh does not dispute, nor could he, that Szekely Nep espoused anti-American views and pro-Nazi philosophy during Koreh's tenure. See, e.g., App. at 1195-1204 (article entitled "Roosevelt-The Emperor of the World"); App. at 1327-35 (article entitled "How the World's Jews Forced the American People to Go to War").

directives of the Hungarian Government in power in 1942"); App. at 1614 (denying admission to person who admitted association with newspaper published under Nazi supervision that demonstrated "pro-Nazi sentiment"); App. at 1615 (denying admission to woman whose husband was editor-in-chief of rightist German newspaper and wrote anti-Allies and anti-Jewish articles in Hungarian newspaper).

This evidence clearly supports the government's position, accepted by the district court, that Szekely Nep constituted a "movement hostile to the United States" for DPA purposes.[11]  The DPC decisions demonstrate that the DPC's focus was on the sentiment expressed in the newspapers, not the formal institutional association of the newspaper.  Insofar as the DPC decisions suggest that some connection with an Axis government is required, see, e.g., App. at 1614, the record shows both that Szekely Nep received some degree of editorial direction from the Hungarian government and that Szekely Nep could not have operated without a government license.  We therefore conclude that Szekely Nep constituted a "movement hostile to the United States" for the purposes of section 13 of the DPA.

We must then consider Koreh's attempt to distinguish Sokolov and Marschalko on the ground that those defendants

---

[11].  Of course, the DPC decisions are not dispositive of our interpretation of the "movement hostile" language.  Instead they undermine Koreh's suggestion that for DPA status there was a clear distinction between private and public newspapers which published anti-American, pro-Nazi articles.

personally advocated Nazism or anti-Semitism by writing articles in official or semi-official newspapers. He argues, as he did in connection with the "assistance" and "advocacy" grounds for denaturalization, that the degree of his personal involvement in the publication process is a disputed issue of material fact. Koreh contends that "participation or membership" must be construed to take into account the degree of a defendant's involvement in the organization, in order that those tangentially affiliated with a movement deemed hostile to the United States (such as a janitor, a sportswriter, etc.) would not be barred by section 13.

In most cases involving the "movement hostile" prong of the DPA, there is little question that the defendant participated actively in actions deemed hostile to the United States. See, e.g., Breyer, 41 F.3d at 890-91 (defendant's voluntary service in Nazi concentration camp guard unit constituted membership in a movement hostile to the United States); Kowalchuk, 773 F.2d at 497 n.11 (suggesting that defendant's voluntary service in Ukrainian militia organized by the Nazis constituted membership in a movement hostile to the United States). That does not mean that those whose actions were of a different order do not also fall within the statutory prescription.

We find particularly persuasive the decision of Judge Bechtle in United States v. Osidach, 513 F. Supp. 51 (E.D. Pa. 1981) that "membership in a movement hostile to the United

States" required only willing membership in such an organization "without proof of personal participation in acts of persecution." Id. at 72. As that court pointed out, the plain language of section 13 contains no requirement that a defendant personally participate in any hostile acts committed by the movement, and the legislative history suggests that Congress sought to exclude all "members" of such groups, regardless of the degree of their participation. Id. at 73-75. This led it to conclude that "[t]he only qualifying restriction as to willing membership does not go to the type or personal degree of membership but, rather, to the type of movement in which a person is a member." Id. at 74.[12] It is unlikely that Congress, which enacted the DPA in part to assist the victims of Nazi persecution, wanted to extend the DPA's benefits to persons who were voluntary members of movements that assisted in that persecution.[13]

There is no dispute that Koreh voluntarily assumed the position as Responsible Editor of Szekely Nep. In light of our

_____

[12]. Relying upon this conclusion, the Osidach court concluded that an individual who was a voluntary member of the Ukrainian police from 1942-44 was a member of a movement hostile to the United States because those police assisted the Germans during the war, regardless of whether he personally participated in any acts of persecution. 513 F. Supp. at 78-79, 96.

[13]. While no courts have directly addressed the issue, at least one other court of appeals has implicitly accepted the Osidach court's interpretation of the provision. See Laipenieks v. INS, 750 F.2d 1427, 1431 (9th Cir. 1985) (noting that in a deportation action, unlike a denaturalization action involving the DPA, "more than willing membership in a movement is required to establish deportability").

conclusion that the newspaper constituted a "movement hostile to the United States," we will also affirm the district court's conclusion that Koreh was ineligible for a visa under the "movement hostile" provision of section 13 of the DPA.[14]

E.

## **Laches**

Koreh unsuccessfully argued that the government's claim was barred by laches because it was investigating this case in 1982 but failed to file a complaint until 1989.  The elements of laches are (1) lack of diligence by party against whom the defense is asserted and (2) prejudice to the party asserting the defense.  Waddell v. Small Tube Prods., Inc., 799 F.2d 69, 74 (3d Cir. 1986).  Koreh apparently contends that the delay in bringing the denaturalization action was inexcusable, and that he suffered prejudice due to the delay.

The government argues that laches is unavailable in a denaturalization proceeding and that its use as a defense in such a case is unprecedented.  This court has not yet decided that issue.  In Costello v. United States, 365 U.S. 265, 281 (1961),

---

[14].  We note that the district court's conclusion on this issue could also be affirmed by relying upon the alternative grounds advanced by the government: Koreh's position in the Information Section of the Royal Hungarian Ministry of National Defense and Propaganda during 1943-44.  Koreh does not dispute that he voluntarily assumed this governmental position, and there is little question that the Ministry, as an organ of the Hungarian Axis government during World War II, constituted a "movement hostile to the United States" for the purposes of section 13 of the DPA.  Because there are ample other bases to affirm, we need not rely on a ground not reached by the district court.

the Supreme Court acknowledged that some federal courts have held that "laches is not a defense against the sovereign," but because the Court concluded that the laches claim in that case would fail on its merits, it did not decide whether the defense was applicable in a denaturalization proceeding. Id. at 282-84.

The government points to Fedorenko, a later case, where the Supreme Court noted that "district courts lack equitable discretion to refrain from entering a judgment of denaturalization against a naturalized citizen whose citizenship was procured illegally or by willful misrepresentation of material facts." 449 U.S. at 517. Although the Fedorenko Court was not discussing the availability of a laches defense, the government reasons that this language bars such a defense because laches involves the use of a district court's "equitable discretion." The government also cites several decisions by federal district courts holding that a laches defense is not available in a denaturalization proceeding. See, e.g., United States v. Schmidt, No. 88 C 9475, 1990 WL 6667, at *10 (N.D. Ill. Jan. 3, 1990), aff'd, 923 F.2d 1253 (7th Cir.), cert. denied, 502 U.S. 921 (1991); United States v. Schuk, 565 F. Supp. 613, 615 (E.D. Pa. 1983); see also United States v. Kairys, 600 F. Supp. 1254, 1264 (N.D. Ill. 1984), aff'd, 782 F.2d 1374, 1384 (7th Cir.) (noting on appeal that the court need not reach the issue because the defendant did not meet the burden of proving laches), cert. denied, 476 U.S. 1153 (1986).

Under the facts of this case, we need not resolve the question of the availability of a laches defense to a denaturalization action. We agree with the district court that even if such a defense were available, Koreh has failed to establish the elements required to maintain the defense. A party asserting the defense of laches has the burden of establishing the elements of the defense. See EEOC v. Great Atlantic & Pacific Tea Co., 735 U.S. 69, 80 (3d Cir.), cert. dismissed, 469 U.S. 925 (1984). Koreh has not shown that he has suffered any specific prejudice from the government's alleged lack of diligence in bringing the case.

While Koreh makes a blanket assertion that the delay has resulted in the loss of potential witnesses due to death, he does not identify any individual who might have helped his defense. Indeed, as discussed above, because Koreh has admitted that he obtained and maintained the license to publish Szekely Nep, an action which we find sufficient to support the conclusion that he personally participated in the newspaper's anti-Semitic advocacy and assistance in persecution, it is difficult to see how any additional testimony would aid in his defense.

We therefore conclude that the district court did not err in refusing to accept Koreh's affirmative defense of laches.

IV.

## Conclusion

For the foregoing reasons, we will affirm the order of the district court.