Justice Thomas,
dissenting.
The “persecutor bar” in the Immigration and Nationality Act (INA) denies asylum and the withholding of removal to any alien who has “ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U. S. C. §§ 1101(a)(42), 1158(b)(2)(A), 1231(b)(3)(B)(i). The Board of Immigration Appeals (BIA), principally relying on this Court’s decision in Fedorenko v. United States, 449 U. S. 490 (1981), held that the statute does not require that the persecution be voluntarily inflicted. The Court of Appeals for the Fifth Circuit affirmed.
According to the Court, Fedorenko, which construed the similar text of a persecution bar in the Displaced Persons Act of 1948 (DPA), is largely irrelevant to the question presented here. See ante, at 518-523; see also ante, at 525 *539 (Scalia, J., concurring). The majority further holds that the INA is ambiguous as to “whether coercion or duress is relevant in determining if an alien assisted or otherwise participated in persecution” and that the agency, therefore, should interpret the statute in the first instance to determine whether it reasonably can be read to include a voluntariness requirement. Ante, at 517, 523-524; see also ante, at 525 (Scalia, J., concurring). I disagree with both of these conclusions. Because the INA unambiguously precludes any inquiry into whether the persecutor acted voluntarily, i. e., free from coercion or duress, I would affirm the judgment of the Court of Appeals. I respectfully dissent.
I
Petitioner Daniel Girmai Negusie testified to the Immigration Judge (I J) that he was forced to work as an armed guard for four years at an Eritrean prison camp where prisoners were persecuted because of their religious beliefs. According to petitioner, part of his job was “to firmly control the prisoners, to punish the prisoners, too, by exposing them” to the extreme heat of the African sun. App. 58. The guards “would ... hold [a] stick [with] their hand” and follow prisoners who were being forced to “roll on the ground in the sun.” Id., at 23. Because “it was extremely hot,” prisoners would quickly “get tired and [feel] shortness of breath and stop” rolling. Id., at 24. They were then beaten. Prisoners typically could not survive this punishment for more than two hours. Indeed, at least one prisoner died from sun exposure while petitioner stood guard. See ante, at 515 (majority opinion).
Petitioner testified that, as a guard, he prevented the prisoners from showering and forbade them from leaving their rooms for fresh air. This form of punishment was particularly severe because the prisons were “built from stone and bricks” with “no cooling system, no ventilation, no windows,” and intolerable heat. App. 20, 30. Petitioner also pre *540 vented prisoner escapes, for which the punishment was forced sun exposure. And, although petitioner never used “electricity to torture” prisoners, he was aware that his supervisor did. Id., at 61-62.
But petitioner, who had converted to Protestantism when he was confined as a prisoner at the camp, also testified that he did not want to persecute any of the prisoners because his new religion taught him “to be merciful.” Id., at 34. Thus, at times he disobeyed his orders. On one occasion, he gave water to a prisoner who was dying from sun exposure. On another occasion, he let female prisoners take showers after they had been denied that privilege “for a long time.” Id., at 37. Petitioner also occasionally allowed some of the prisoners to “go outside during the night and during the evenings and . . . refresh themselves in the fresh air.” Id., at 37-38.
After four years as a prison guard, petitioner deserted his post, swam to a shipping container, and hid inside. See ante, at 515 (majority opinion). The container arrived in the United States with petitioner inside on December 20, 2004. Petitioner applied for asylum and the withholding of removal under the INA, 8 U. S. C. § 1101 et seq. He also applied for protection under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment (CAT), under which it is “the policy of the United States not to expel, extradite, or otherwise effect the involuntary return of any person to a country in which there are substantial grounds for believing the person would be in danger of being subjected to torture.” Foreign Affairs Reform and Restructuring Act of 1998, § 2242(a), 112 Stat. 2681-822, note following 8 U. S. C. § 1231, p. 263 (United States Policy with Respect to Involuntary Return of Persons in Danger of Subjection to Torture (hereinafter CAT Policy)). See also CAT, Dec. 10, 1984, S. Treaty Doc. No. 100-20,1465 U. N. T. S. 85. Petitioner feared that, if returned to Eritrea, he would “be *541 executed” because he had converted to Protestantism and deserted his military post. App. 65, 68.
The INA provides the Executive with the discretion to grant asylum to aliens that are “unable or unwilling” to return to their home country “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U. S. C. §§1101(a)(42)(A), 1158(b)(1). The INA also requires the Executive to withhold removal of aliens to a country in which there is a “clear probability” that their “life or freedom would be threatened” because of their “race, religion, nationality, membership in a particular social group, or political opinion.” § 1231(b)(3)(A). However, the INA prohibits the Executive from granting asylum or withholding removal if an alien “ordered, incited, assisted, or otherwise participated in the persecution” of any person on account of “race, religion, nationality, membership in a particular social group, or political opinion.” § 1158(b) (2)(A)(i) (asylum); § 1231(b)(3)(B) (withholding of removal). Nonetheless, in light of the CAT’s requirement that “[n]o State Party shall . . . return ... a person to another State where there are substantial grounds for believing that he would be in danger of being subjected to torture,” Art. 3, S. Treaty Doc. No. 100-20, at 20, regulations implementing that convention provide “deferral of removal” to aliens subject to the INA persecutor bar who would more likely than not be tortured if removed to their home country.[1] 8 CFR *542 §§ 1208.16(c)(4), (d)(2), 1208.17(a) (2008); see also CAT Policy (b), at 263 (requiring federal agencies to “prescribe regulations to implement the obligations of the United States under Article 3 of the . [CAT], subject to any reservations, understandings, declarations, and provisos contained in the United States Senate resolution of ratification of the Convention”).
The IJ denied petitioner’s applications for asylum and the withholding of removal, but granted him deferral of removal. The BIA affirmed. In their view, petitioner’s conduct objectively qualified as assistance or participation in the persecution of others based on religion. See ante, at 515-516 (majority opinion). Relying on Fedorenko, the IJ and BIA found that even if petitioner was “compelled to participate as a prison guard” against his wishes, his “motivation and intent are irrelevant to the issue of whether he ‘assisted’ in persecution.” Ante, at 516 (some internal quotation marks omitted). Therefore, petitioner was ineligible for asylum or the withholding of removal under the INA. The IJ and BIA agreed, however, that petitioner qualified for deferral of removal because it is “more likely than not that he would be tortured” if returned to Eritrea given that its “government has used deadly force and threatened to use deadly force against deserters.” App. to Pet. for Cert. 20a, 19a. The Court of Appeals affirmed. See Negusie v. Gonzales, 231 Fed. Appx. 325, 326 (CA5 2007) (per curiam).
II
As with all statutory interpretation questions, construction of the INA’s persecutor bar must begin with the plain language of the statute. See Jimenez v. Quarterman, ante, at 118 (citing Lamie v. United States Trustee, 540 U. S. 526, 534 (2004)). If the text of a statute governing agency action “‘directly addresse[s] the precise question at issue,’” then “ ‘that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.’” National Assn. of Home Builders v. *543 Defenders of Wildlife, 551 U. S. 644, 665 (2007) (quoting Chevron U. S. A. Inc. v. Natural Resources Defense Council, Inc., 467 U. S. 837, 842-843 (1984)).
A
A court must first “look to the particular statutory language at issue.” K mart Corf. v. Cartier, Inc., 486 U. S. 281, 291 (1988). As the majority acknowledges, see ante, at 518, the text of the INA’s persecutor bar neither includes the term “voluntary” nor contains an exception for involuntary, coerced conduct. The statute instead applies to any alien who “ordered, incited, assisted, or otherwise participated in the persecution of any person” on account of a protected ground. 8 U. S. C. §§ 1101(a)(42), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i).
The statute’s key terms also do not imply any voluntariness requirement for persecution. Under the ordinary meaning of the term “persecution” at the time of the statute’s enactment in 1980 and its reenactment in 1996, the act of persecution alone is sufficient to classify one’s conduct as persecution. See Webster’s Ninth New Collegiate Dictionary 877 (1991) (hereinafter Webster’s Ninth) (defining “persecution” as “the act or practice of persecuting esp. those who differ in origin, religion, or social outlook”); see also Webster’s New Collegiate Dictionary 855 (1975) (hereinafter Webster’s) (same). The term itself includes no intrinsic mens rea requirement. As a result, an individual can “persecute” — meaning “harass in a manner designed to injure, grieve, or afflict” — without having designed the act or intended for injury, grief, or affliction to occur. Webster’s Ninth 877; see also Webster’s 855 (same).
The persecutor bar’s inclusion of those who “assist” or “participate” confirms that it does not include a voluntariness requirement. The term “assist” is defined as “to give support or aid,” Webster’s Ninth 109, or “to help,” Oxford American Dictionary 36 (1980) (hereinafter Oxford). See *544 also Black’s Law Dictionary 111 (5th ed. 1979) (hereinafter Black’s) (defining “assist” as “[t]o help; aid; succor; lend countenance or encouragement to; participate in as an auxiliary”). And “participate” means simply “to take part,” Webster’s Ninth 858, or “to have a share, to take part in something,” Oxford 487; see also Black’s 1007 (defining “participate” as “[t]o receive or have a part or share of; to partake of; experience in common with others; to have or enjoy a part or share in common with others”). Accordingly, this Court has concluded that the ordinary meanings of “assist” and “participate” do not “connote voluntariness.” Pennsylvania Dept. of Corrections v. Yeskey, 524 U. S. 206, 211 (1998) (participate); see also Fedorenko, 449 U. S., at 512 (assist). These are “terms and concepts of breadth,” Russello v. United States, 464 U. S. 16, 21-22 (1983), that require only that an individual take “some part in” an activity, or help it to occur in some way, Reves v. Ernst & Young, 507 U. S. 170, 178-179 (1993) (emphasis in original). Even if participation or assistance is coerced, it remains participation or assistance just the same.
B
In addition to the particular statutory section of the INA before the Court, “the language and design of the statute as a whole” is instructive in determining the provision’s plain meaning. K mart Corp., supra, at 291; see also Amoco Production Co. v. Gambell, 480 U. S. 531, 552-553 (1987). Here, the INA’s design and structure buttress the conclusion that the persecutor bar applies irrespective' of voluntariness.
First, Congress has evidenced its ability to both specifically require voluntary conduct and explicitly exclude involuntary conduct in other provisions of the INA. See infra, at 552-553. For example, Congress has barred admission to the United States of totalitarian party members unless their membership was “involuntary,” 8 U. S. C. § 1182(a)(3)(D)(ii), and it has provided for the termination of asylum when an alien “has voluntarily availed himself or herself” of another *545 country’s protections, § 1158(c)(2)(D). “[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.” Russello, supra, at 23 (internal quotation marks omitted); see, e. g., Barnhart v. Sigmon Coal Co., 534 U. S. 438, 452-454 (2002). The absence of a voluntariness requirement in the INA persecutor bar is no exception.
Second, federal immigration law provides calibrated remedies, which include partial refuge for specified aliens who have both suffered from and inflicted persecution. Those who have been persecuted and have not engaged in persecution may receive both asylum and the withholding of removal. §§ 1231(b)(3)(A), 1158(b)(1)(A). Those at the other end of the spectrum, who have not been persecuted but have persecuted others, may not receive either asylum or the withholding of removal. §§ 1231(b)(3)(B)(i), 1158(b)(2)(A)(i). And finally, for many individuals who (like petitioner) have both persecuted others and been persecuted, the scheme provides temporary refuge; they will receive deferral of removal under the CAT if they will face torture upon their return to their home country. CAT Policy (a), at 263; see also 8 CFR §§ 1208.13(a), 1208.16(d)(2).
Where “Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions,” courts should not read one part of the legislative regime (the INA) to provide a different, and conflicting, solution to a problem that has already been specifically addressed elsewhere in the federal immigration regime (regulations implementing the CAT). Varity Corp. v. Howe, 516. U. S. 489, 519 (1996) (Thomas, J., dissenting); see also Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U. S. 11, 19 (1979). Federal law provides only partial protection to a victim of persecution who has also engaged in persecution, voluntarily or not. There simply is no justification for writ *546 ing into the INA’s persecutor bar the greater protections of asylum and the withholding of removal for individuals who were coerced into engaging in persecution. That is, the “assumption of inadvertent omission” of a voluntariness requirement in the INA “is rendered especially suspect upon close consideration of [a statute’s] interlocking, interrelated, and interdependent remedial scheme” that addresses the specific problem at issue in a conflicting way. Massachusetts Mut. Life Ins. Co. v. Russell, 473 U. S. 134, 146-147 (1985).[2]
C
Finally, Congress is aware of a judicial interpretation of statutory language and “adopt[s] that interpretation when it re-enacts a statute without change.” Lorillard v. Pons, 434 U. S. 575, 580 (1978); see also Traynor v. Turnage, 485 U. S. 535, 546 (1988); 2B N. Singer & J. Singer, Sutherland on Statutory Construction § 49.9, pp. 127-133 (7th ed. 2008). Here, the statutory and decisional backdrop against which Congress enacted the INA’s persecutor bar counsels against grafting a voluntariness requirement onto the statute.
When Congress enacted the INA’s persecutor bar, it essentially retained the language used in similar predecessor statutes. Under the 1948 DPA persecutor bar, entry was denied *547 to all who “ ‘assisted the enemy in persecuting civilians].’ ” Fedorenko, supra, at 495 (quoting 62 Stat. 3051). In 1950, Congress added a second persecutor bar to the DPA that applied “to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin.” § 13,64 Stat. 227. In the years that followed, Congress continued to use this same broad language in denying asylum to specific categories of persecutors. See, e. g., § 105, 91 Stat. 1224 (denying permanent residence to aliens from Vietnam, Laos, and Cambodia “who ordered, assisted, or otherwise participated in the persecution of any person because of race, religion, or political opinion”); 8 U. S. C. §§ 1182(a)(3)(E), 1227(a)(4)(D) (authorizing the exclusion of anyone who had been associated with Nazi forces and had “ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion”); § 14(a), 67 Stat. 406 (imposing persecutor bar on “any person who personally advocated or assisted in the persecution of... [a] group of persons because of race, religion, or national origin”).
Congress then enacted the INA bar in 1980. This statute comprehensively labeled as a persecutor “any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion.” § 201(a), 94 Stat. 102-103. Congress reenacted the INA’s persecutor bar in 1996 and retained its breadth. See Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), §§ 305(a)(3), 601(a)(1), 604(a), 110 Stat. 3009-602, 3009-689, 3009-691.
Congress’ uninterrupted use of this broad statutory language, which parallels the persecutor bars dating back to 1948, was not accidental. By the time of the 1996 reenactment, this Court had specifically interpreted the plain language of the predecessor bars to apply regardless of the voluntariness of a persecutor’s conduct. See Fedorenko, *548 449 U. S., at 512 (1948 DPA bar); see also United States v. Koreh, 59 F. 3d 431, 439 (CA3 1995) (1950 DPA bar); United States v. Schmidt, 923 F. 2d 1253, 1258 (CA7 1991) (1948 DPA bar); Maikovskis v. INS, 773 F. 2d 435, 445-446 (CA2 1985) (8 U. S. C. § 1251(a)(19) (1982 ed.), transferred to § 1227(a)(4)(D) (2006 ed.)). In particular, this Court had held that the phrase in the 1948 DPA bar, “assisted the enemy in persecuting civilians],” contained no “‘involuntary assistance’ exception.” Fedorenko, 449 U. S., at 512. Rather, the statute’s “plain language” made clear that “an individual’s service as a concentration camp armed guard — whether voluntary or involuntary — made him ineligible for a visa.” Ibid.
In light of this legal backdrop, Congress’ decisions in 1980 and 1996 to retain a persecutor bar that broadly applies to anyone who “assisted, or otherwise participated in the persecution” of any person, §§ 1158(b)(2)(A)(i), 1231(b)(3)(B), is significant evidence that Congress did not intend to include any involuntariness exception in the INA bar. This Court must assume, absent textual proof to the contrary, that Congress was aware of the Fedorenko decision when it reenacted the persecutor bar and thus “adopt[ed] that interpretation when it re-enact[ed the] statute without change,” Lorillard, supra, at 580.
D
In sum, the INA’s persecutor bar does not require that assistance or participation in persecution be voluntary or uncoerced to fall within the statute’s reach. It instead “mandates precisely” what it says: “[A]n individual’s service as a [prison] camp armed guard — whether voluntary or involuntary — ma[kes] him ineligible for” asylum or withholding of removal if the guard’s service involved assistance or participation in the persecution of another person on account of a protected ground. Fedorenko, supra, at 512. Here, it is undisputed that petitioner servéd at a prison camp where guards persecuted prisoners because of their religious beliefs. See ante, at 515 (majority opinion). It also is undis *549 puted that petitioner carried out the persecution by preventing prisoners from escaping and by standing guard while at least one prisoner died from sun exposure.. Ibid. Petitioner, therefore, “assisted, or otherwise participated,” in persecution and thus is statutorily disqualified from receiving asylum or withholding of removal under the INA.[3]
Ill
The majority nevertheless concludes the statute’s “silence,” ante, at 518, creates ambiguity, and therefore remands the case to the BIA for it to determine, in the first instance, whether persecution must be voluntary to fall within the terms of the INA’s persecutor bar. “The Court’s efforts to derive ambiguity from th[e] utmost clarity” of the persecutor bar, however, “are unconvincing” in every respect. INS v. St. Cyr, 533 U. S. 289, 329 (2001) (Scalia, J., dissenting).
*550 The majority principally finds ambiguity in the statutory text because it does not include either the word “voluntary” or the word “involuntary.” See ante, at 519. But a statute cannot be deemed ambiguous until the court “exhaustjs] the aid of the ‘traditional tools of statutory construction’” and determines that Congress did not resolve the issue under consideration. Clark v. Martinez, 543 U. S. 371, 402 (2005) (Thomas, J., dissenting) (quoting Chevron, 467 U. S., at 843, n. 9). Deeming a statute with broad terms to be ambiguous for that reason alone essentially requires Congress either to obey a judicially imposed clear-statement rule or accept the risk that the courts may refuse to give full effect to a statute’s plain meaning in the name of Chevron deference. Not every difficult question of statutory construction amounts to a statutory gap for a federal agency to fill. See ante, at 529-531 (opinion of Stevens, J.). And the Court should not, “in the name of deference, abdicate its responsibility to interpret a statute” simply because it requires some effort. Global Crossing Telecommunications, Inc. v. Metrophones Telecommunications, Inc., 550 U. S. 45, 77 (2007) (Thomas, J., dissenting).
The majority makes no attempt to apply the “traditional tools of statutory construction” to the persecutor bar before retreating to ambiguity. See ante, at 517-518. Rather, it merely observes that Congress could have spoken more directly to the issue, which it finds sufficient to render the statute ambiguous on this score. Ante, at 518. But the absence of a phrase specifying that the provision applies to both involuntary and voluntary conduct is not definitive proof of ambiguity. It is certainly correct that Congress “‘could have spoken in clearer terms,’” Clark, 543 U. S., at 402 (Thomas, J., dissenting), as it almost always can in any statute. However, this “proves nothing” in evaluating whether the statute is ambiguous. Ibid. The question before the Court instead is whether Congress has provided an unambiguous answer in the plain language that it chose to *551 use. Here, for the reasons just explained, the traditional tools of statutory interpretation show with “utmost clarity,” St. Cyr, supra, at 329 (Scalia, J., dissenting), that the statute applies regardless of the voluntariness of the alien who participates or assists in persecution.[4]
The majority also finds ambiguity based on differences between the INA and the DPA statutory bar considered in Fedorenko. In particular, the majority points to the Fedorenko Court’s reliance on a second part of the DPA persecutor bar, which applied to those who “ ‘voluntarily assisted the enemy forces ... in their operations against the United Nations.’” 449 U. S., at 495, and n. 4 (quoting 62 Stat. 3052; emphasis added). The Court noted that “[u]nder traditional principles of statutory construction, the deliberate omission of the word ‘voluntary’ from §2(a),” which addressed the assistance of persecution — but not from § 2(b) — “compelled] the conclusion that the statute made all those who assisted in the persecution of civilians ineligible for visas.” 449 U. S., at 512. According to the majority, because the INA persecutor bar, unlike the DPA bar, does not include a provision limited by the word “voluntarily” adjacent to the provision that is not so limited, the absence of the adverb here cannot carry the significance given it in Fedorenko. See ante, at 519.
The majority’s reasoning is flawed. The mere fact that the INA’s persecutor bar is not accompanied by a neighbor *552 ing provision containing the word “voluntarily” does not negate the significance of the term’s absence when other INA provisions are explicitly limited to actions undertaken voluntarily. As noted above, see supra, at 544-545, the INA imposes a voluntariness requirement in a host of statutory provisions, see, e. g., 8 U. S. C. § 1158(c)(2)(D) (terminating asylum when alien has “voluntarily” availed himself of the protection of his country); §§ 1182(a)(3)(D)(i)-(ii) (denying admission and naturalization to those who have been members of, or affiliated with, “the Communist or any other totalitarian party” unless that membership or affiliation was “involuntary”); § 1182(d)(3)(B)(i) (2006 ed., Supp. I) (denying admission to those who have “voluntarily and knowingly” engaged in, endorsed, espoused, or persuaded others to endorse, espouse, or support terrorist activity); §1229c(a)(l) (allowing an alien to “voluntarily” depart the United States); §§ 1424(a), (d) (precluding naturalization for members of certain totalitarian parties, unless membership was “involuntary”); § 1481(a) (providing for loss of nationality by “voluntarily” performing certain specified acts with the intention of relinquishing nationality).[5]
In the immigration and naturalization context, then, Congress is certainly capable of declaring its preference for a voluntariness requirement. That Congress’ explicit references to voluntariness appear in other sections of this particular statutory scheme, rather than in subsections of §§1158 or 1231, is immaterial. Cf. Russello, 464 U. S., at 23; Barn *553 hart, 534 U. S., at 452-454. And the fact that Congress, in the course of making structural revisions to the statutory-regime, eliminated the specific dichotomy the Court noted in Fedorenko does not undermine the critical point: The INA expressly includes a voluntariness requirement in several places but does not impose such a requirement in the persecution bar. Thus, the omission of the word “voluntarily” from the persecutor bar in the INA is just as conclusive as its omission from the persecutor bar in the DPA. With respect to both statutes, the deliberate omission “compels the conclusion that the statute made all those who assisted in the persecution of civilians ineligible for visas.” 449 U. S., at 512.
Finally, the majority concludes that the DPA bar is distinguishable from the INA bar because the former was enacted in the context of the “‘“crime against humanity that [was] involved in the concentration camp,” ’ ” which was so horrific that it is in a category all its own. Ante, at 520 (quoting Fedorenko, supra, at 511, n. 32). In that unique context, the majority reasons, it made sense to exclude “even those involved in nonculpable, involuntary assistance in Nazi persecution.” Ante, at 520. But the majority cannot intend to suggest that all acts of persecution during the Second World War were inherently more depraved or reprehensible than all acts of persecution that have occurred in the decades since the IN As enactment.
Certainly, no such conclusion is compelled by the statutory text. Congress has steadfastly condemned all acts of persecution. See 22 U. S. C. §§6401(a)(5)-(7) (noting that “Congress has recognized and denounced acts of religious persecution,” which can be “severe and violent” and “particularly widespread, systematic, and heinous under totalitarian governments and in countries with militant, politicized religious majorities”); § 6401(b)(5) (announcing that it is the “policy of the United States” to “stan[d] with the persecuted”); §501, 78 Stat. 1015 (“The Congress condemns the persecution of *554 any persons because of their religion”); Refugee Act of 1980, § 101(a), 94 Stat. 102, note following 8 U. S. C. §1521 (“The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands”). There is no reason to deny the INA persecutor bar its full meaning based on a speculative assumption that Congress, in 1980, could not have meant to oppose persecution quite as intensely as it did in the aftermath of World War II. Rather, the INA’s persecutor bar naturally extends to all acts of persecution and, therefore, requires the denial of asylum and withholding of removal for “even those involved in nonculpable, involuntary assistance in . . . persecution.” Ante, at 520 (majority opinion).
IV
Because I conclude that the INA’s persecutor bar applies whether or not petitioner’s assistance or participation in persecution was voluntary, and because it is conceded that petitioner assisted and participated in persecution while serving as an armed prison guard in Eritrea, I would affirm the decision of the Court of Appeals. Accordingly, I respectfully dissent.

 “Deferral of removal” was created to accommodate Congress’ direction to exclude those who fall within the INA persecutor bar “[t]o the maximum extent consistent with the obligations of the United States under the [CAT]” not to return an alien to a country in which he or she will be tortured. CAT Policy (e), at 263. To accomplish that goal, deferral of removal provides “a less permanent form of protection than withholding of removal and one that is more easily and quickly terminated if it becomes possible to remove the alien consistent with Article 3” of the CAT, 64 Fed. Reg. 8480 (1999), while also “ensuring] that [such aliens] are not returned to a country where they would be tortured,” id., at 8481.

 It also is important to acknowledge that the object of the INA is to codify Congress’ policy decisions ‘“pertaining to the entry of aliens and their right to remain’” in the United States — decisions that are “‘entrusted exclusively to Congress.’” Kleindienst v. Mandel, 408 U. S. 753, 766, 767 (1972) (quoting Galvan v. Press, 347 U. S. 522, 531-532 (1954)). In fact, “over no conceivable subject is the legislative power of Congress more complete than it is over” the decision of Congress to admit or to exclude aliens. Oceanic Steam Nav. Co. v. Stranahan, 214 U. S. 320, 339 (1909). Courts therefore must enforce the immigration policy decision reflected in a statute’s plain terms, even if Congress has chosen “to forbid the entrance of foreigners within its dominions” altogether, Fong Yue Ting v. United States, 149 U. S. 698, 705 (1893). Likewise, here, where Congress has made a judgment about which persons to admit and exclude from the country, it is not for this Court to question the wisdom of that choice.

 Justice Stevens also finds the language of the INA’s persecutor bar “plain,” but concludes that it must incorporate a culpability requirement because the statute applies to those whose “acts are of a ‘criminal nature.’ ” See ante, at 534, 537 (opinion concurring in part and dissenting in part). I disagree. The decision to admit an alien is a matter of legislative grace, see n. 2, supra, for which judicial review has been “consistently classified” as civil in nature, Harisiades v. Shaughnessy, 342 U. S. 580, 594 (1952); see also Zadvydas v. Davis, 533 U. S. 678, 720 (2001) (Kennedy, J., dissenting) (explaining that “‘an alien seeking initial admission to the United States requests a privilege and has no constitutional rights regarding his application, for the power to admit or exclude aliens is a sovereign prerogative’ ” (quoting Landon v. Plasencia, 459 U. S. 21, 32 (1982))). There is no warrant to read criminal-law requirements into a statute that is “nonpunitive in purpose and effect.” Zadvydas, supra, at 690. Further, the eonelusory pronouncement in the Office of the United Nations High Commissioner for Refugees’ Handbook on Procedures and Criteria for Determining Refugee Status ¶ 162 (reedited Jan. 1992), that “it has to be assumed, although this is not specifically stated, that the acts covered by the present clause must also be of a criminal nature,” is insufficient to require criminal proof to deny withholding of removal, contra, ante, at 536-537 (opinion of Stevens, J.). The United Nations handbook “is not binding on the Attorney General, the BIA, or United States courts.” INS v. Aguirre-Aguirre, 526 U. S. 415, 427 (1999).

 Because this Court should not delegate the interpretation of the persecutor bar’s plain meaning to a federal agency, see Board of Governors, FRS v. Dimension Financial Corp., 474 U. S. 361, 368 (1986), it is largely irrelevant whether the BIA properly relied on Fedorenko v. United States, 449 U. S. 490 (1981), in interpreting the statute, see ante, at 521-523 (majority opinion); ante, at 525 (Scalia, J., concurring). In any event, the BIA’s construction of the INA’s persecutor bar correctly reflected the text of the provision. There is no reason to remand the question to the agency when only one construction of the statute is permissible and the agency’s original decision adopted that proper construction. See National Cable & Telecommunications Assn. v. Brand X Internet Services, 545 U. S. 967, 982-985 (2005).

 Moreover, in the Refugee Act of 1980, which added the persecutor bar to the INA, Congress separately codified its desire to “promote opportunities for resettlement or voluntary repatriation.” § 101(a), 94 Stat. 102, note following 8 U. S. C. § 1521. In 1996, when Congress reenacted the statutory text, it retained the persecution bar’s broad language while again restricting other sections to voluntary conduct. See IIRIRA, § 304, 110 Stat. 3009-587 (relating to “voluntary departure”); § 402, id., at 3009-656 (relating to “voluntary” participation in pilot programs for confirming employment eligibility); § 604, id., at 3009-692 (providing for termination of asylum when alien “voluntarily” takes certain actions).